[No. 17304-9-I. Division One. June 3, 1987.]

THE STATE OF WASHINGTON, *Respondent*, v. ROBBY
A. HOSKINSON, *Appellant*.

*Dominic L. Bacetich* and *Paul Stocker,* for appellant.

*Michael E. Rickert, Prosecuting Attorney,* for respondent.

RINGOLD, J.—The defendant, Robby A. Hoskinson, appeals his conviction for first degree assault. He assigns error to the trial court's ruling that admitted into evidence the videotaped confession of an alleged accomplice. We conclude that the trial court erred in admitting the videotaped confession, and reverse.

On January 16, 1985, Hoskinson was arrested in connection with the January 14, 1985, shooting of Bruce Stier. Also arrested were Jeffrey Good (Hoskinson's housemate) and Tina Pederson (Hoskinson's girl friend and Stier's niece). Good apparently gave a detailed statement implicating all three in the shooting. The police then resumed their questioning of Good, which was videotaped. The videotape was admitted into evidence at Good's May 1985 trial. The charges were dismissed against Pederson.

On July 16, 1985, Hoskinson was charged by information with one count of first degree assault while armed with a firearm or a deadly weapon in violation of RCW 9A.36-.010(1)(a). Before his trial, Hoskinson moved to suppress the admission of Good's videotaped statement. The court denied the motion.

At trial, Stier testified that around 4 a.m. on January 14, 1985, he was awakened by a loud noise at the front door. He got up, walked into the living room and heard a voice outside telling him to get dressed and come out to help get a car out of the ditch. Stier looked out the window and saw a man wearing military fatigues, but could not see his face except for his profile. After the man refused to identify himself, Stier refused to leave the house, and the man walked away. Stier testified that a few minutes later, he

decided that maybe the man really did need help and went outside to investigate. As Stier walked down the driveway toward the road, he was shot in the shoulder with a 30/30 rifle.

Stier further testified regarding the bad relationship he had with his sister, Theresa Pederson, and her daughter, Tina Pederson. He related that he and Theresa had violent fights and that to please her mother, Tina expressed her dislike for him. Stier stated that he would not be surprised if they had hired someone to hurt him.

Ron Panzero, of the Skagit County Sheriff's Department, testified that while investigating the incident he found a .30 caliber spent bullet embedded in a tree root. Also discovered were footprints made by military boots with a "walking W" pattern.

Deputy Sheriff Johnny Rose executed a search warrant at the residence of Hoskinson and Good. Found in one bedroom of the residence were a Winchester .30 caliber rifle, several .30 caliber cartridges, several pieces of military–style camouflage clothing, including a jacket with the name "Hoskinson" sewn on, military–style combat boots with a "walking W" pattern on the soles, and a knit cap and leather gloves.

Russell Hoskinson, the defendant's father, testified that he had given his son the Winchester rifle. An expert in fire–arm identification related that the spent shell casing found at the scene had been fired from that rifle.

Out of the presence of the jury, the State called Good to testify. After admitting that he had been convicted of second degree assault, Good invoked his Fifth Amendment rights and refused to say anything further. The court ruled that Good was legally unavailable as a witness and, consistent with its previous ruling, admitted the videotape of Good's statement which the jury watched. The jury found Hoskinson guilty of first degree assault while armed with a deadly weapon.

Hoskinson contends that the trial court, in admitting Good's videotaped statement, denied his right to confront

witnesses under both the Sixth Amendment to the United States Constitution, and Const. art. 1, § 22 (amend. 10).[1] The State maintains Good's statements were sufficiently reliable, and that the trial court correctly admitted the videotape into evidence under the standards set forth in *State v. Dictado,* 102 Wn.2d 277, 687 P.2d 172 (1984).

### RELIABILITY OF CODEFENDANT'S STATEMENT

We start this analysis with the principle made explicit by the Supreme Court in *Lee v. Illinois,* 476 U.S. 530, 90 L. Ed. 2d 514, 525–26, 106 S. Ct. 2056 (1986), and implicitly recognized by our Supreme Court that:

> [A] codefendant's confession is presumptively unreliable as to the passages detailing the defendant's conduct or culpability because those passages may well be the product of the codefendant's desire to shift or spread blame, curry favor, avenge himself, or divert attention to another.

*Lee,* 90 L. Ed. 2d at 529.

Mr. Justice Brennan reemphasized the fundamental importance of the confrontation clause. Speaking for the majority in *Lee,* he stated:

> On one level, the right to confront and cross–examine adverse witnesses contributes to the establishment of a system of criminal justice in which the perception as well as the reality of fairness prevails. To foster such a system, the Constitution provides certain safeguards to promote to the greatest possible degree society's interest in having the accused and accuser engage in an open and even contest in a public trial. The Confrontation Clause advances these goals by ensuring that convictions will not be based on the charges of unseen and unknown—and hence unchallengeable—individuals.
>
> But the confrontation guarantee serves not only symbolic goals. The right to confront and to cross–examine

---

[1]Const. art. 1, § 22 (amend. 10):

"In criminal prosecutions, the accused shall have the right . . . to meet the witnesses against him face to face . . ."

U.S. Const. amend. 6:

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . ."

witnesses is primarily a functional right that promotes reliability in criminal trials. In *California* v. *Green,* 399 U. S. 149, 158 (1970), we identified how the mechanisms of confrontation and cross–examination advance the pursuit of truth in criminal trials. Confrontation, we noted,

"(1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross–examination, the 'greatest legal engine ever invented for the discovery of truth'; (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness making his statement, thus aiding the jury in assessing his credibility." (footnote omitted).

Our cases recognize that this truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant without the benefit of cross–examination. As has been noted, such a confession "is hearsay, subject to all the dangers of inaccuracy which characterize hearsay generally . . . More than this, however, the post–arrest statements of a codefendant have traditionally been viewed with special suspicion. Due to his strong motivation to implicate the defendant and to exonerate himself, a codefendant's statements about what the defendant said or did are less credible than ordinary hearsay evidence." *Bruton* v. *United States,* 391 U. S. [123,] 141 [(1968)] (White, J., dissenting) (citations omitted).

Thus, in *Douglas* v. *Alabama,* 380 U. S. 415 (1965), we reversed a conviction because a confession purportedly made by the defendant's accomplice was read to the jury by the prosecutor. Because the accomplice in that case, while called to the witness stand, invoked his privilege against self–incrimination and refused to answer questions put to him, we held that the defendant's "inability to cross–examine [the accomplice] as to the alleged confession plainly denied him the right of cross–examination secured by the Confrontation Clause." *Id.,* at 419 . . . This holding, on which the Court was unanimously agreed, was premised on the basic understanding that when one person accuses another of a crime under circumstances in which the declarant stands to gain by

inculpating another, the accusation is presumptively suspect and must be subjected to the scrutiny of cross–examination.

Over the years since *Douglas,* the Court has spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants.

*Lee,* 90 L. Ed. 2d at 525–26. The confrontation clause is not an absolute bar to hearsay implicating the accused. When a hearsay declarant is not present for cross examination at trial, both constitutions require a showing that the declarant is unavailable, and then, the declarant's statement is admissible only if it bears adequate indicia of reliability. Reliability can be inferred where the evidence falls within a firmly rooted exception to the hearsay rule. In other cases, the evidence must be excluded unless it is supported by showing particularized guaranties of trustworthiness. *Ohio v. Roberts,* 448 U.S. 56, 66, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980); *State v. Dictado, supra* at 287–88; *State v. Edmondson,* 43 Wn. App. 443, 448, 717 P.2d 784 (1986).

In the case sub judice, there was no dispute that Good was unavailable since his conviction was on appeal, and thus he could continue to claim his Fifth Amendment right against self–incrimination. *Dictado,* at 287. The videotape evidence here does not fall within a firmly rooted exception to the hearsay rule.[2] The issue then posed is whether there are "particularized guaranties of trustworthiness" which would make the statement sufficiently reliable.

■ The trustworthiness of extrajudicial statements may be evaluated using factors such as the close proximity of the conversation to the crime, whether the statements were spontaneous and against the declarant's penal interest, whether there was an apparent reason for the declarant to lie, whether there was incentive to provide truthful information, whether the statements were corroborated by

---

[2]It is not within the coconspirator exception to the hearsay rule ER 801(d)(2)(v) because the statement was taken after the conspiracy had ended. *Dictado,* at 283; 5A K. Tegland, Wash. Prac., *Evidence* § 350, at 168–69 (2d ed. 1982).

admissions of the defendant, and whether other evidence at trial supported the statements. These factors are not exclusive. All circumstances which indicate whether the statements are reliable should be considered. *Dictado*, at 288.

After the police implicated Good in the shooting, he gave a detailed statement. In the videotaped statement, Good related that Tina Pederson and her mother drove to his and Hoskinson's residence. Hoskinson went out to their car to talk. Tina and her mother left. Hoskinson came back inside the house and told Good to put on camouflage clothing because "they were going to teach somebody a lesson." After getting dressed, Good and Hoskinson picked up Tina and proceeded to Stier's house. Good understood the plan to be that Tina was going to aim the rifle at Stier's wife while he and Hoskinson would coax Stier outside and beat him up. He stated that after parking the car, with Hoskinson carrying the rifle, all three approached Stier's house. When they got to the door Hoskinson told Good to knock and say that he had been in an accident and needed help. They were not successful in getting Stier out of the house and began walking back toward the road. As they looked back and saw someone walking toward them, they squatted so as not to be seen. Good then heard two shots from the rifle and screaming. The three ran to the car and returned to their residence.

We now consider the *Dictado* factors. The statement was given on January 16, 1985, only 2 days after the crime, but the testimony and circumstances of the statement diminish its reliability. *See State v. Parris*, 98 Wn.2d 140, 151, 54 P.2d 77 (1982). "[O]nce partners in a crime recognize that the 'jig is up,' they tend to lose any identity of interest and immediately become antagonists, rather than accomplices." *Lee v. Illinois*, 90 L. Ed. 2d at 528. The videotaped version of the statement is not spontaneous as both sides agree it was merely Good responding to leading questions. In addition, while the statement was against Good's penal interest in the sense that he implicated himself, he also placed most of the blame on Hoskinson. There was reason for Good to

lie and to provide untruthful information. It would be to his advantage to cooperate with the police and to exculpate himself from responsibility for firing the rifle. It does not appear that Hoskinson admitted anything as he did not testify and no other admissions were presented.

The sixth factor in *Dictado* deserves more attention. While the other evidence at trial does not appear to contradict the statement, the evidence could lend support to a scenario that Good was more involved than he admitted and maybe it was he who pulled the trigger. Part of the problem is that the evidence was not thoroughly developed at trial: (1) "Walking W" footprints were found at the scene. A pair of boots with a "walking W" pattern on the soles was found at the residence of Good and Hoskinson. No evidence was presented as to the ownership of the boots; (2) While there was testimony that Hoskinson's father had given him the rifle which had injured Stier, there was no testimony regarding fingerprints which might have been found on the rifle; (3) It appears that at one time, Stier had related that the man at the door had been wearing a knit cap, but Stier's testimony on this point was not brought out at trial. While there was testimony that a knit cap was found at the residence of Good and Hoskinson, there was no testimony regarding ownership of the cap. The *Dictado* factors are inconclusive to establish reliability.

The Sixth Amendment requires the exclusion of the videotape. In *Douglas v. Alabama,* 380 U.S. 415, 417, 13 L. Ed. 2d 934, 85 S. Ct. 1074 (1965), Loyd and Douglas were separately tried on charges of assault with intent to commit murder. Loyd was tried first and found guilty. He was then called as a witness at Douglas' trial. Because he was appealing his conviction, Loyd invoked his privilege against self–incrimination and refused to answer any questions concerning the crime. The trial court ruled that Loyd could not rely on the privilege and granted the prosecutor's motion to declare Loyd a hostile witness so he could be cross–examined. The prosecutor then read from a document which apparently was Loyd's confession, pausing after

every few sentences to ask Loyd if he had made the statement. Each time Loyd asserted the privilege, but the prosecutor continued until the entire document had been read. The document, seriously implicating Douglas, was not offered into evidence. The jury found Douglas guilty. The Supreme Court reversed Douglas' conviction, finding that under the circumstances, Douglas' inability to cross-examine Loyd regarding the alleged confession denied him the right of cross examination secured by the confrontation clause. *Douglas,* 85 S. Ct. at 1077.

In *Bruton v. United States,* 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, 1628 (1968), the trial court instructed the jury that the confession could only be used against the codefendant and had to be disregarded with respect to the defendant. The Court, nevertheless, held that the admission of a codefendant's confession that implicated the defendant at their joint trial was prejudicial error and denied the defendant his right of cross examination. *Bruton,* 88 S. Ct. at 1628. The Court in *Ohio v. Roberts,* 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980) held that the defendant's rights under the confrontation clause were not violated by the introduction into evidence of the preliminary hearing testimony of a witness unavailable at trial. The Court determined that the testimony bore sufficient indicia of reliability because the witness had been subjected to what amounted to sufficient cross examination, giving the trier of fact a satisfactory basis for evaluating the truth of the testimony. *Roberts,* 100 S. Ct. at 2541–43.

In *Lee* the petitioner and a codefendant were charged with committing a double murder and were tried jointly in a bench trial. Except for the joint trial, the facts regarding Good's statements are strikingly similar. The Court held that the trial court erred in relying on portions of the codefendant's confession as substantive evidence against Lee and constituted a violation of his Sixth Amendment rights. *Lee,* 90 L. Ed. 2d at 530. The Court determined that the unsworn confession was unreliable as it was elicited only after the codefendant was told that the petitioner had

already implicated him and it was untested by any cross examination or its equivalent. *Lee,* 90 L. Ed. 2d at 528. Further, the Court was not persuaded that the confession was reliable because it "interlocked" with the petitioner's confession on some points.[3]

In the case sub judice, Good's statements are unreliable. Unlike the statement in *Roberts,* it was subject to no cross examination at any time. Second, it was made up of a series of leading questions and 1–word answers. Third, it should be viewed with suspicion given the fact that it was a post–arrest statement. Due to the strong motivation of the confessor to implicate the others involved, the statements about what they did are less reliable than other hearsay evidence. *Lee,* 90 L. Ed. 2d at 526. We, therefore, hold that Hoskinson's rights under the confrontation clause were violated by the admission into evidence of the videotape.

■ Given the constitutional nature of this error, it is only harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result in the absence of the error. Constitutional error is presumed prejudicial and the State bears the burden of proving that the error was harmless. *State v. Guloy,* 104 Wn.2d 412, 425, 704 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020, 89 L. Ed. 2d 321, 106 S. Ct. 1208 (1986). Under the "overwhelming untainted evidence" test, the untainted evidence was not so overwhelming that it necessarily led to a finding of guilt. *Guloy,* at 426. In fact, on appeal the State admits its case is very weak without the videotape.[4, 5] We find that the error was prejudicial and reverse.

---

[3]*See Cruz v. New York,* __ U.S. __, 95 L. Ed. 2d 162, 107 S. Ct. 1714 (1987) and *Richardson v. Marsh,* __ U.S. __, 95 L. Ed. 2d 176, 107 S. Ct. 1702 (1987) for recent Supreme Court opinions considering further constraints to the admissibility of a codefendant's implicative statements.

[4]At trial, the State did not concede that without the videotape, there was insufficient proof to convict Hoskinson as it appears to concede now. At trial, it merely related that the videotape "is the State's case except for some physical evidence."

As the trial court's error in admitting Good's videotaped statement is dispositive of the case, we decline to reach the other issue raised.

SCHOLFIELD, C.J., and COLEMAN, J., concur.

---

[5]Hoskinson's argument that his Sixth Amendment right to counsel was violated because his attorney had no opportunity to question Good during the videotaping need not be considered because he cites no authority for the proposition that his attorney should have been present during the questioning of a codefendant. RAP 10.3(a)(5).