[Nos. 24045-5-I; 24206-7-I. Division One. September 9, 1991.]

THE STATE OF WASHINGTON, *Respondent*, v. DOUGLAS A. GREER, ET AL, *Appellants*.

780

*Lennell R. Nussbaum* of *Washington Appellate Defender Association,* for appellants.

*David S. McEachran, Prosecuting Attorney,* and *Mac D. Setter, Deputy,* for respondent.

PEKELIS, J. — This case arises out of the joint trial of Douglas A. Greer and Frank P. Barrie. Greer appeals his conviction on one count of first degree robbery and one count of first degree burglary. Barrie appeals his conviction on one count of complicity to first degree robbery and one count of complicity to first degree burglary. Barrie assigns error to the admission of his postarrest statements to law enforcement officers. Greer also claims that Barrie's statements should not have been admitted because it violated his constitutional right to confront witnesses. They both contend that the prosecutor made improper statements during closing argument.

I

On the morning of October 6, 1988, Greer, Hovde, and Barrie drove to Sethney's home to collect on a drug debt Sethney owed Greer. According to Sethney, she awakened with Greer "at the side of my bed with his hand on my throat and a knife saying 'Where is my f------ money'".

Greer pulled Sethney out of bed and took her into the living room. While he was yelling at her, Hovde entered through the front door which had somehow been unlocked. Upon seeing Hovde, Greer put the knife he was holding back into a leather sheath.

Sethney testified that Greer talked about taking her television set as collateral and suggested that she sell her car. Greer then told Sethney that he had a friend that came up to take care of his business and that Sethney was never going to see Greer again. At this point, Barrie entered the house. Greer introduced Barrie saying, "I'd like you to meet . . . my friend Barrie. Barrie, meet Sandy. Don't forget his face". Greer directed Sethney to deliver the money to Barrie at the Horizon Bank at 2 o'clock that afternoon. He warned her not to involve the police. At some point, Greer seized Sethney's class ring from her finger as collateral for the debt.

Sethney further testified that Barrie initially stood near her with his back against the wall drinking a beer and "staring". He had a "cold look" on his face, and except for a brief conversation with Greer, did not speak. Barrie later proceeded to "check out" Sethney's bedroom, a bathroom, a window, and a sliding glass door. He also went into Sethney's daughter's room, turned on the light, and took a hanger from her closet. When asked what was going through her mind at the time, Sethney testified that she thought Barrie was a "hit man" who was going to kill her if she did not pay the money.

After Sethney agreed to meet Barrie with the money, Hovde, Greer, and Barrie left the house. They returned a short time later, however, because Barrie had locked the keys in the car. Greer told Sethney to give them a ride. She gathered her two children, placed them in the front seat of her car, and drove to a rest area in Alger pursuant to Greer's directions.

Upon arriving at the rest area, Sethney parked next to a blue station wagon. Greer used the knife he had been

carrying and the hanger taken earlier by Barrie to unlock the car door. Sethney then drove back to Bellingham with her children.

At approximately 2 p.m., Sethney reported the events of earlier that morning to the Whatcom County Sheriff's Office. Based on the interview with Sethney, sheriff's detectives arrested Hovde and Barrie in the early hours of October 13, 1988, and transported them to the Whatcom County Jail.

That morning, Barrie was screened in jail by Peggy Wight of the Office of Assigned Counsel (OAC). Barrie advised Wight that he wanted an attorney. Wight determined that he was eligible for appointed counsel and submitted a referral to the public defender's office on his behalf.

A short time later, Peter Guyer, a corrections officer at the jail, received a telephone call from Detective Charles Frakes. Guyer testified that Detective Frakes told him that Barrie and Hovde were not to have access to anyone or the phone until they had been interviewed.[1] Guyer advised Frakes that Barrie had been interviewed by the OAC earlier that morning.

At approximately 12:10 p.m., an intern from the public defender's office arrived at the jail to conduct an intake interview with Barrie and Hovde. Guyer testified that he turned the intern away because the floor officers in the jail were on their lunch break and because he was following Detective Frakes' instructions.

Thereafter, Guyer attempted to telephone Detective Frakes to advise him that the public defender's office had requested to see Barrie. Frakes was eventually paged and arrived at the jail a short time later accompanied by Detective Steve DeFries. The detectives brought Barrie into an interrogation room and advised him of his

---

[1]Frakes was apparently concerned that Hovde or Barrie may try to communicate with Greer, who had not yet been picked up.

*Miranda* rights.[2] It is undisputed that Barrie told the detectives that he understood his rights and wished to waive them. Detective DeFries testified that at no time during the interview did Barrie express a desire to remain silent or request to speak with an attorney.

Approximately 10 minutes after the detectives began their interview, the intern returned with Jill Bernstein, an attorney with the public defender's office. Bernstein asked to speak with Barrie. Shirley Nicholas, the jail supervisor, explained to Bernstein that it was jail policy not to interrupt an ongoing interview between law enforcement officers and an inmate. At Bernstein's insistence Nicholas advised the officers of Bernstein's desire to see Barrie. However, Detective Frakes informed her that he was not through yet and that the prosecutor's office had said that he could finish his interview.

Soon thereafter, Bernstein returned with a court order directing the detectives to provide her immediate access to Barrie. After briefly consulting with him, Bernstein advised Frakes and DeFries that Barrie preferred not to say any more at that time.

On October 14, 1988, Greer was charged by information with one count of first degree robbery, RCW 9A.56.190, .200, and one count of first degree burglary, alleged to have been committed while armed with a deadly weapon, RCW 9A.52.020(1)(a), 9.94A.125. In the same information, Barrie was charged with one count of complicity in first degree robbery, RCW 9A.56.190, 9A.08.020(3)(a)(ii), and one count of complicity in first degree burglary, RCW 9A.52.020(1)(a), 9A.08.020(3)(a)(ii).

Prior to trial, Barrie moved to suppress his postarrest statements. Greer also filed a motion to suppress Barrie's statements, arguing that because they implicated him in the charged crimes, the statements should be excluded or the trials severed.

___

[2] *Miranda v. Arizona*, 384 U.S. 436, 479, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

After a hearing, the trial court denied both motions. The court concluded that Barrie's statements were voluntary and admissible. The court, however, limited the detectives' testimony to Barrie's statements that "he [Barrie] walked and looked around the house and looked mean" and that Sethney "was crying and was emotionally upset."

At trial, the State called as witnesses Sethney, Hovde, Tina Patrick, a friend of Sethney's, and detectives Frakes and DeFries. On direct examination, Sethney identified a knife recovered from Barrie at the time of his arrest as similar to the one with which Greer had threatened her. She testified that Barrie was not in the house when Greer held the knife to her throat and that she was not sure whether he was in the house when Greer took the ring off her finger. Sethney also admitted that some of her statements to sheriff's officers and defense counsel were inaccurate. Sethney explained that she lied because her father had threatened to disown her if she ever became involved with drugs again.

Hovde testified that on the way over to Sethney's residence, she, Greer, and Barrie talked in general about collecting the money from Sethney. She stated that when she entered the house, Greer was demanding the money from Sethney. She described him as being "angry" and "mean" and Sethney as "crying and scared". Hovde also testified that when Barrie entered the house, "he acted like Doug's collector or bodyguard." She stated that although nothing explicit had been said, it was clear to her that this was what he was doing.

Tina Patrick testified that she was visited by Sethney between 10:30 and 11 a.m. on October 13, 1988. Patrick related that Sethney told her what had happened earlier that morning and asked to borrow the money to pay Greer. Patrick declined. On cross examination Patrick testified that Sethney did not have a very good reputation in the community for telling the truth.

In compliance with the court's pretrial ruling, Detectives DeFries and Frakes testified that Barrie told them he had gone inside Sethney's residence, looked around, and tried to look mean. They also testified that Barrie told them that Sethney was crying and emotionally upset and that she then took him to a rest area in Alger because he had locked his keys in the car.

Greer took the witness stand in his own defense. He testified that he had gone to Sethney's house with Barrie and Hovde to collect the debt and was angry about being put off. He knocked on Sethney's door and she invited him inside. Greer denied taking the ring from Sethney, stating instead that she gave it to him as a sign of good faith. He did not threaten her with a knife.

Greer also testified that he never described Barrie to Sethney as a hit man, enforcer, or someone from out of town who was there to "take care of business." Moreover, it was Sethney who suggested the meeting at the bank. Greer stated that Barrie went to the bank to meet her, but Sethney did not show up.

In closing argument, the prosecutor made the following statement:

[As jurors] [y]ou decide whether or not [the defendants] will be held to account for what they did . . . The fact this is between purveyors of bad substances and users of bad substances should not make a difference to you whatsoever because if it did, it would demonstrate a prejudice or sympathy on your part and I know that you won't make a decision on that basis. . . . I'd ask you to send a clear message out from this box into this community that these two defendants are accountable. I'd ask that you find the defendants, Greer and Barrie, guilty as charged. Thank you.

A jury found Greer and Barrie guilty as charged and returned a special verdict finding that Greer was armed with a deadly weapon at the time of the burglary. Both received sentences within the standard range. Barrie and Greer appeal.

## II

Barrie contends that the trial court erred in admitting his postarrest statements at trial. He argues that the statements were obtained in violation of (1) the fifth and fourteenth amendments to the United States Constitution, and article 1, sections 3 and 9 of the state constitution, and (2) CrR 3.1.

■ In *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966), the United States Supreme Court established that the Fifth Amendment's prohibition against compelled self-incrimination requires that a custodial interrogation be preceded by advice to the suspect that he has the right to remain silent and the right to the presence to counsel. *Miranda*, 384 U.S. at 479. The *Miranda* Court recognized, however, that these rights could be waived. *Miranda*, 384 U.S. at 475. In order for the suspect's waiver to be valid, the State must show that it was made voluntarily, knowingly, and intelligently. *Lego v. Twomey*, 404 U.S. 477, 486-87, 30 L. Ed. 2d 618, 92 S. Ct. 619 (1972).

In *Edwards v. Arizona*, 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 101 S. Ct. 1880 (1981), the Court reaffirmed these rules by establishing that once a suspect asserts the right to counsel, the current interrogation must not only cease, it may not resume "until counsel has been made available to him, unless the accused himself initiates further communication". This is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights." *Michigan v. Harvey*, ___ U.S. ___, 108 L. Ed. 2d 293, 302, 110 S. Ct. 1176 (1990).

■ Here, Barrie first argues that his request for appointed counsel to the OAC interviewer is sufficient to invoke the *Edwards* rule. We disagree. An OAC employee's referral to the public defender's office of an indigent defendant's request for representation does not constitute the type of expression necessary to trigger

*Edwards*. At a minimum, the rule of that case requires "some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police." McNeil v. Wisconsin*, ___ U.S. ___, 115 L. Ed. 2d 158, 169, 111 S. Ct. 2204 (1991); *accord, State v. Stewart*, 113 Wn.2d 462, 472-73, 780 P.2d 844 (1989). It is uncontroverted that, during the custodial interrogation, Barrie did not request counsel.

Barrie next asserts that the police conduct in this case constitutes the kind of "trick[ery]" that vitiates the validity of his waiver. *Miranda*, 384 U.S. at 476. However, under the United States Supreme Court's decision in *Moran v. Burbine*, 475 U.S. 412, 89 L. Ed. 2d 410, 106 S. Ct. 1135 (1986) and the recent State Supreme Court opinion in *State v. Earls*, 116 Wn.2d 364, 805 P.2d 211 (1991), the fact that Barrie voluntarily, knowingly, and intelligently waived his right to counsel before giving his statement is dispositive of his Fifth Amendment and Const. art. 1, § 3 claims.

■ We recognize that *Burbine* does not foreclose the possibility that the conduct of the police may be so egregious that due process would be violated. *See Burbine*, 475 U.S. at 432. However, we are mindful that "[a] reviewing court should not pass on constitutional matters unless absolutely necessary to its determination of the case." *State v. Ng*, 110 Wn.2d 32, 36-37, 750 P.2d 632 (1988). Because we conclude that any error in the admission of his postarrest statements was harmless beyond a reasonable doubt, we do not address the constitutional issue here.

■ It is long established that constitutional errors may be so insignificant as to be harmless. *State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985), *cert. denied*, 475 U.S. 1020 (1986); *Harrington v. California*, 395 U.S. 250, 251-52, 23 L. Ed. 2d 284, 89 S. Ct. 1726 (1969). "A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable

jury would have reached the same result in the absence of the error." *Guloy*, 104 Wn.2d at 425. In performing this analysis, Washington courts use an "overwhelming untainted evidence" test. *Guloy*, 104 Wn.2d at 426. Under this test, the court will look only at the untainted evidence to determine whether that evidence alone is so overwhelming that it necessarily leads to a finding of guilt. *Guloy*, 104 Wn.2d at 426.

Applying the test here, we are persuaded beyond a reasonable doubt that the overwhelming untainted evidence presented would have led the jury to find Barrie guilty as an accomplice. It is undisputed that Barrie drove Greer and Hovde to Sethney's house to collect the illegal drug debt and that it was Barrie who went to the bank later that day to meet Sethney and collect the money from her. Sethney identified the knife recovered from Barrie at the time of his arrest as similar to the one Greer used to threaten her. She also testified that Greer referred to Barrie as, in essence, his "enforcer". Even if Sethney was not found to be entirely credible by the jury, this characterization was confirmed by the unimpeached testimony of Hovde who accompanied Greer and Barrie to the house. Hovde stated that Barrie clearly played the part of Greer's enforcer by the way he looked the house over and by looking mean. Thus, there was overwhelming evidence, even without Barrie's statement that he walked around the house and "looked mean", of his complicity in the robbery and burglary.[3]

Barrie next contends that the actions of the police here violated CrR 3.1 which provides in pertinent part:

**(b) Stage of Proceedings.**
(1) *The right to counsel shall accrue as soon as feasible after the defendant is taken into custody,* appears before a committing magistrate, or is formally charged, whichever occurs earliest.

. . . .

**(c) Explaining the Availability of a Lawyer.**

---

[3] Barrie's other statement concerning Sethney's emotional state implicates Greer, not him.

. . . .
(2) At the earliest opportunity a person in custody who desires counsel shall be provided access to a telephone, the telephone number of the public defender or official responsible for assigning counsel, and *any other means necessary to place the person in communication with a lawyer."*

(Italics ours.)

■ In the instant case, the uncontroverted facts demonstrate that the jail personnel and the detectives conspired to keep Barrie and counsel apart. When apprised that the intern had asked to see Barrie, the detectives not only hurried down to the jail to begin their interrogation, they also refused counsel's request to see Barrie or her request that he be advised that she was there. Thus, the actions of the jail personnel and the detectives deliberately thwarted the purpose of CrR 3.1, which is to provide a suspect with access to an attorney at the earliest opportunity.

Nonetheless, as analyzed above, any actual error in the admission of Barrie's postarrest statement that he "looked mean" was immaterial to the outcome of the case, and thus harmless.[4] *State v. Thomas*, 110 Wn.2d 859, 862, 757 P.2d 512 (1988). However, because this error will usually not be "harmless", we emphasize that when a defendant has expressed a desire for counsel, the deliberate interference with counsel's efforts to communicate with the defendant is violative of CrR 3.1.[5]

### III

We next address Greer's contention that the admission of Barrie's statements at trial resulted in a denial of his

---

[4]The right to counsel as provided in CrR 3.1 is not of constitutional origin. *See State v. Clark*, 48 Wn. App. 850, 863, 743 P.2d 822, *review denied,* 109 Wn.2d 1015 (1987); *State v. Guzman-Cuellar*, 47 Wn. App. 326, 334, 734 P.2d 966, *review denied,* 108 Wn.2d 1027 (1987). Thus, we apply the nonconstitutional harmless error test to an alleged violation of the court rule.

[5]In finding that there was overwhelming untainted evidence of Barrie's guilt, we necessarily reject his challenge to the sufficiency of the evidence supporting his convictions, which is analyzed under a more deferential standard of review than is harmless error.

right to confront witnesses under both the Sixth Amendment and Const. art. 1, § 22 (amend. 10).[6]

 The right to confront one's witnesses under both the federal and state constitutions "is a fundamental right in our criminal justice system." *State v. St. Pierre*, 111 Wn.2d 105, 111, 759 P.2d 383 (1988). In defining the scope of this right, the Supreme Court has made explicit that a codefendant's statement implicating a defendant is presumptively unreliable and thus inadmissible unless it bears "sufficient 'indicia of reliability' to rebut the presumption." *Lee v. Illinois*, 476 U.S. 530, 543, 90 L. Ed. 2d 514, 106 S. Ct. 2056 (1986) (quoting *Ohio v. Roberts*, 448 U.S. 56, 66, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980)).

Here, Greer claims that the trial court erred in admitting Barrie's statement that he "walked around trying to look mean" while inside Sethney's home. On its face, it is questionable whether this statement even inculpates Greer in the charged crimes. Nonetheless, to the extent that Barrie's statement may suggest that Greer asked him to adopt that demeanor, we believe it to be sufficiently reliable and thus admissible against Greer.

 The trustworthiness of a codefendant's statements may be evaluated using such factors as whether the statements were corroborated by admissions of the defendant, and whether other evidence at trial supported the statements. *State v. Hoskinson*, 48 Wn. App. 66, 71-72, 737 P.2d 1041 (1987) (citing *State v. Dictado*, 102 Wn.2d 277, 687 P.2d 172 (1984)).[7]

---

[6]Const. art. 1, § 22:

"In criminal prosecutions the accused shall have the right . . . to meet the witnesses against him face to face . . .".

U.S. Const. amend. 6:

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . .".

[7]Other factors include the close proximity of the conversation to the crime, whether the statements were spontaneous and against the declarant's penal interest, whether there was an apparent reason for the declarant to lie, and whether there was incentive to provide truthful information. *Hoskinson*, 48 Wn. App. at 71.

Here, Greer's own testimony supports the reliability of Barrie's postarrest statement. Greer testified that Barrie was present at Sethney's house and that Sethney was "crying and upset". Hovde and Sethney also testified to this effect. Accordingly, the admission of Barrie's corroborated statement did not violate Greer's right of confrontation.

## IV

Finally, Barrie and Greer contend that the prosecutor's remarks in closing argument deprived them of a fair trial. They assert that the prosecutor made prejudicial allusions to their drug usage and to the community's expectation that a guilty verdict would be returned.

In closing arguments, counsel are allowed to draw and express reasonable inferences from the evidence produced at trial. *State v. Hale*, 26 Wn. App. 211, 611 P.2d 1370 (1980), *review denied*, 95 Wn.2d 1030 (1981). On the other hand, "'[m]ere appeals to jury passion and prejudice, as well as prejudicial allusions to matters outside the evidence, are inappropriate.'" *State v. Belgarde*, 110 Wn.2d 504, 507, 755 P.2d 174 (1988) (quoting *State v. Belgarde*, 46 Wn. App. 441, 448, 730 P.2d 746 (1986), *review granted*, 108 Wn.2d 1002 (1987).

We disagree with appellants' contention. The portion of closing argument they cite must be read in context. The record shows that throughout the entire proceedings counsel for Barrie and Greer sought to discredit Sethney's testimony by portraying her as a "coke whore" and a liar. The State was entitled to challenge this portrayal by reminding the jury that the fact the case involved "purveyors of bad substances and users of bad substances" was unimportant. In so stating, the prosecutor was well within his role as both an advocate and officer of the court. Thus, we conclude that the prosecutor's remarks did not constitute an appeal to the jury's passion and

prejudice. On the contrary, they appear to constitute an appeal for the jury *not* to decide the case on this basis.

Affirmed.

WEBSTER, A.C.J., and COLEMAN, J., concur.