[No. 20080-5-II.    Division Two.    December 31, 1997.]
THE STATE OF WASHINGTON, *Respondent*, v. JONATHAN M. KIRKPATRICK, *Appellant*.

*Thomas E. Doyle* and *Robert Quillian*, for appellant (appointed counsel for appeal).

*Jeremy R. Randolph, Prosecuting Attorney*, and *J. Andrew Toynbee, Deputy*, for respondent.

ARMSTRONG, J. — Jonathan Kirkpatrick appeals his conviction for murder in the first degree. He claims ineffective assistance of counsel because his trial attorney failed to assert a violation of the court rule requiring access to an attorney "[a]t the earliest opportunity." CrR 3.1(c)(2). We hold that the counsel's performance was deficient, but we affirm because Kirkpatrick has failed to demonstrate prejudice.

## FACTS

Larry and Joyce Robertson owned and operated a conve-

nience store near Winlock, Washington. Ms. Robertson was shot and killed in the store at approximately 5:00 A.M. on February 26, 1993. When officers arrived at the scene, they noticed that coffee had been freshly brewed, that the till was empty, and that the cash register had recorded only one sale for 79 or 89 cents. A store employee would later testify that when she closed the store the previous night, the till contained approximately $114.

The State's medical examiner determined that Ms. Robertson died from a wound inflicted by a gun fired at Ms. Robertson's left eye from six inches away. Detectives recovered a casing and bullet from a 9mm Ruger at the crime scene. According to investigators, information regarding Ms. Robertson's eye wound and the type of weapon used in the crime was not released to the public.

Lewis County Detective Steve Hamilton and Lewis County Deputy Keith Ivie arrested Jonathan Kirkpatrick at the Port Angeles Police Department in July 1993. Detective Hamilton advised Kirkpatrick of his *Miranda*[1] rights. Kirkpatrick agreed to speak and the two talked for 90 minutes. At first, Kirkpatrick denied any involvement in the crime, but later said he was present in the parking lot when the store clerk was killed inside. After giving this statement, Kirkpatrick asked if he could leave. Detective Hamilton told him he could not. Kirkpatrick then demanded a lawyer. Detective Hamilton stopped questioning Kirkpatrick, but made no effort to contact a lawyer for Kirkpatrick.

During the four-hour drive to Lewis County, Kirkpatrick initiated three conversations with Detective Hamilton. The detective reminded him that he had asked for an attorney and that the detective could not talk to him, but Kirkpatrick said he did not want an attorney and wanted to talk about the case. Kirkpatrick then described the crime and admitted shooting the clerk, but said that Peter Hawkins made him do it.

[1]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966).

Later, at the Lewis County Sheriff's office, Kirkpatrick gave a taped confession, admitting that he shot a female convenience-store clerk in the face with a 9mm Ruger handgun. Again, Kirkpatrick claimed that he was forced to kill her because his friend, Peter Hawkins, who was apparently high on drugs, was pointing a gun at him and demanding that he shoot her.

During the suppression hearing, Kirkpatrick's attorney asked Deputy Ivie if any efforts had been made to connect Kirkpatrick with an attorney. The State objected, contending the question was irrelevant because the officers had "no duty to do that." Kirkpatrick's attorney countered that it was relevant "to inquire if any efforts were made to allow Mr. Kirkpatrick a phone call to contact a lawyer." He continued: "There was no testimony that there was a telephone even in the room, so the officers had to do something for him to be allowed to make connection with an attorney." The court sustained the State's objection. The court ultimately concluded that all of Kirkpatrick's statements were admissible because he had waived his right to counsel by "re-initiat[ing]" each conversation. The court later admitted the taped statement at trial.

During the trial, Arthur Jensen testified that he sneaked out of his work release facility to go with Kirkpatrick and Peter Hawkins to see a friend in Winlock. During the drive, Jensen saw Kirkpatrick with a 9mm handgun. The three eventually visited Ms. Robertson's convenience store because Hawkins wanted to buy beer and cigarettes. Hawkins went in to the store by himself but returned without beer, complaining that the clerk would not sell him beer that early in the morning. Kirkpatrick, who had finished consuming "a hit of dope," grabbed his pistol and said he was going to get some beer. Jensen then saw Kirkpatrick shoot the woman in the head and run out of the store with a sack of money. Jensen admitted that he had previously told a different story to police—where he heard but did not see the shooting—but said the second version was the truth. He explained that he gave inconsistent stories because he was afraid of being sent back to prison.

Peter Hawkins testified that he and Kirkpatrick picked up Jensen late in the evening of February 25. Kirkpatrick was carrying a Ruger 9mm handgun and was consuming methamphetamine. They stopped at Ms. Robertson's store to buy beer and cigarettes. Hawkins also wanted to buy water to "cook" some drugs. Hawkins went into the store first. When he tried to buy beer, Ms. Robertson told him that alcohol sales were prohibited before 6:00 A.M. She offered him coffee instead. He did not take the coffee but purchased water. As Hawkins walked out of the store, Kirkpatrick entered and asked about the beer. When Hawkins told him they could not buy beer, Kirkpatrick became angry, retrieved his gun from the car, walked up to Ms. Robertson, and shot her in the face. Hawkins said he had tried to stop Kirkpatrick by pointing his gun at Kirkpatrick and saying, "Don't do it." On cross-examination, Hawkins admitted that he told police "[t]wo or three" different versions of the crime. "I just didn't tell them the whole truth and my participation in it," he said. "I was scared I would get prosecuted."

Kirkpatrick's friend, Michael Matt Slifer, testified that in May 1994, Kirkpatrick told him he had killed a woman in Winlock: "He said that she worked in a little convenience store and that the reason being—the reason that he did it is there was some sort of conflict of her kicking him off the property or some sort of conflict of interest and he had shot her with a 38 in the face." When asked if the gun could have been a different caliber, he answered, "It could have been, I'm not sure."

Tom Crybleskey, an acquaintance of Kirkpatrick, testified that Kirkpatrick wanted to work for him as an "enforcer" in illegal drug deals. Crybleskey recounted a conversation in February or March of 1994 during which Kirkpatrick admitted he had murdered someone: "He said him and Pete [Hawkins] and Arthur [Jensen] were on the way back from Portland. They stopped to get the beer and cigarettes, the lady wouldn't sell it to him and he shot her [in the eye]."

Jerry Ridgeway, another acquaintance of Kirkpatrick, testified that at some point in 1994 he considered hiring Kirkpatrick "to beat someone up." While being interviewed for the job, Kirkpatrick told Ridgeway that "he had killed a lady before." Ridgeway did not know where the murder occurred, but he did note that Kirkpatrick "didn't like to come down to Lewis County, Centralia, Chehalis area."

Michelle Davis testified that in September 1994, Kirkpatrick told her that he had "killed people." Davis continued: "He wanted cigarettes and beer, that's what they went there for. And she said something that upset him and he shot her [in the head]."

Kirkpatrick offered an alibi, calling several co-workers who testified that he had been working in Port Angeles the night before the robbery. He also called a counselor from Jensen's work release facility who said it would have been difficult for Jensen to have left the center unnoticed. Finally, Kirkpatrick took the stand and accused Hawkins of committing the crime. He admitted that he told Ridgeway, Crybleskey, and Slifer that he shot Ms. Robertson, but he only did it to impress them and "be cool." But he denied telling Davis. When asked about his self-incriminating statements during the initial interview in Port Angeles and the drive to Lewis County, Kirkpatrick said, "I said what I said so I could get out." He claimed that he was afraid of Hawkins because Hawkins had shot at him a few times and he "had seen [Hawkins] kill people several times in Tacoma." Therefore, he was protecting himself "[b]y protecting Peter Hawkins from the law."

## ANALYSIS

Kirkpatrick claims his counsel was ineffective during the suppression hearing. To establish ineffective assistance of counsel, Kirkpatrick must demonstrate deficient performance and prejudice. *State v. Glenn*, 86 Wn. App. 40, 44, 935 P.2d 679 (1997). Counsel's performance is deficient when it "falls below a minimum objective standard of reasonable attorney conduct." *Glenn*, 86 Wn. App. at 44.

Counsel's deficient performance is prejudicial when "there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

At issue is CrR 3.1(c)(2): "At the earliest opportunity a person in custody who desires a lawyer shall be provided access to a telephone, the telephone number of the public defender or official responsible for assigning a lawyer, and any other means necessary to place the person in communication with a lawyer."[2] Kirkpatrick contends that his counsel's performance was deficient because he did not assert a violation of CrR 3.1(c)(2) at the suppression hearing. Kirkpatrick argues that, as a result, the court ruled that there was "no duty" for officers to connect him with an attorney. This is contrary to the plain language of the rule, says Kirkpatrick, and if his counsel had cited the rule, the trial court would have suppressed his statements as "evidence tainted by the violation." *State v. Copeland*, 130 Wn.2d 244, 282, 922 P.2d 1304 (1996). The State responds that an accused's waiver of *Miranda* rights necessarily waives the State's duty under CrR 3.1(c)(2). And because Kirkpatrick initiated conversations after he had been read his *Miranda* rights, the State asserts that Kirkpatrick waived his rights under CrR 3.1(c)(2). *See, e.g., State v. Aten*, 130 Wn.2d 640, 666, 927 P.2d 210 (1996) ("A suspect or an accused who invokes the [*Miranda*] right to counsel but then initiates further communication or conversation with law enforcement officers without a lawyer is subject to further interrogation.").

■ ■ While CrR 3.1(c)(2) appears similar to the *Miranda* warning, it actually serves a different purpose. CrR 3.1(c)(2) is designed "to provide a meaningful opportunity to contact a lawyer." AMERICAN BAR ASSOCIATION PROJECT ON MINIMUM STANDARDS FOR CRIMINAL JUSTICE, STANDARDS RELATING

---

[2]In the event of a valid *Miranda* waiver, police are not required to advise defendants of their rights under CrR 3.1(c)(2). This is because the rule is activated only after a defendant requests an attorney.

TO PROVIDING DEFENSE SERVICES § 7.1 cmt. d at 62 (Approved Draft, 1968).[3] The *Miranda* warning, on the other hand, is designed to prevent the State from using presumptively coerced and involuntary statements against criminal defendants. *Connecticut v. Barrett*, 479 U.S. 523, 528, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987). Therefore, the *Miranda* warning is only "an important *first step* toward informing the person of the nature of his right to the assistance of counsel." Approved Draft, cmt. a at 60 (emphasis added). "[T]he fact that a warning valid within the meaning of *Miranda* has been made should not in itself be considered to fulfill the requirement of a formal offer [of counsel pursuant to CrR 3.1(c)(2)]." Approved Draft, cmt. b at 61.

█ We conclude that Detective Hamilton and Deputy Ivie did not follow the clear language of CrR 3.1(c)(2). Although the rule does not require the officers to actually connect the accused with an attorney, it does require *reasonable efforts* to do so. *E.g., City of Bellevue v. Ohlson*, 60 Wn. App. 485, 487, 803 P.2d 1346 (1991) (officer made six attempts to telephone arrestee's attorney); *City of Seattle v. Wakenight*, 24 Wn. App. 48, 49-50, 599 P.2d 5 (1979) (officer telephones public defender and gives arrestee phone book and access to phone). But here, the officers made no effort to contact an attorney when Kirkpatrick first requested one at the Port Angeles Police Department. Had they done so, we presume a lawyer would have told Kirkpatrick to remain silent: "[A]ny lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances." *Watts v. Indiana*, 338 U.S. 49, 59, 69 S. Ct. 1357, 93 L. Ed. 1801 (1949) (Jackson, J., concurring).

█ █ We further conclude that Kirkpatrick did not waive his rights under CrR 3.1(c)(2). It is true a defendant

---

[3]"The various parts of Rule 3.1 were extracted from and are almost identical to standards suggested by the . . . ABA's Project on Minimum Standards for Criminal Justice in Providing Defense Services . . . ." CRIMINAL RULES TASK FORCE, WASHINGTON PROPOSED RULES OF CRIMINAL PROCEDURE Rule 3.1 gen. cmt. at 15 (West Publ'g Co. 1971).

may waive rights derived from court rules. But because of the mandatory language of CrR 3.1(c)(2), an accused's waiver of the rule requires more than the State's noncompliance with the rule; it requires an accused's "knowing, intelligent and voluntary" conduct. *State v. Nogueira*, 32 Wn. App. 954, 958, 650 P.2d 1145 (1982) (holding that defendant did not waive CrR 3.5 hearing) (citing *State v. Myers*, 86 Wn.2d 419, 425-26, 545 P.2d 538 (1976)). We find no such conduct here.

*State v. Wade*, 44 Wn. App. 154, 721 P.2d 977 (1986), is distinguishable. There, the defendant invoked his *Miranda* rights and asked for counsel immediately after his arrest. The officers stopped their questioning and took him to the station, where an officer asked the defendant if he would consent to a search of his vehicle. The defendant said no and again requested an attorney. When the booking process was completed, still less than an hour after the defendant was first contacted, he signed a waiver and confessed. Only after the defendant gave a taped confession did officers provide him with a list of public defenders *Wade*, 44 Wn. App. at 157. Division Three of this court concluded that the defendant waived his "right to counsel *before the police had an opportunity* to provide him with access to the phone and a list of attorneys who could possibly defend him." *Wade*, 44 Wn. App. at 159 (emphasis added).

Here, the police first contacted Kirkpatrick more than three hours before he confessed, and Kirkpatrick first asked for an attorney several hours before confessing. Moreover, Kirkpatrick's request came during normal working hours and at a police station, where presumably procedures exist for contacting defense counsel. Thus, the record demonstrates that the "earliest opportunity" to put Kirkpatrick in touch with an attorney was immediately after his request. As recognized in *Wade*, a valid waiver must have occurred before this "earliest opportunity." *See Wade*, 44 Wn. App. at 159 (suggesting that waiver would not have been valid if the police had opportunity to provide access to telephone and did not do so). To hold otherwise would al-

low the State to benefit by its own failure to perform its duty under CrR 3.1(c)(2). In short, unlike in *Wade*, the State has not shown reasonable efforts to contact an attorney, why such efforts could not have been made, or a valid waiver by Kirkpatrick before the "earliest opportunity" arose.

■ ■ While we hold that Kirkpatrick's counsel erred when he did not pursue an argument under CrR 3.1(c)(2), we conclude that, within a reasonable probability, the verdict would have been the same even if the error had not been made. First, Slifer, Crybleskey, Ridgeway, and Davis testified that Kirkpatrick told them he had killed a woman. Slifer, Crybleskey, and Davis knew that the victim was a female store clerk and that she was shot in the face or head in a dispute. Crybleskey testified that Ms. Robertson was shot in the eye, a detail never revealed by the authorities. And Crybleskey and Davis knew the dispute involved cigarettes or beer. Second, Jensen and Hawkins testified that they saw Kirkpatrick shoot Ms. Robertson. And their stories contained corroborating facts. For example, both knew the location of Ms. Robertson's wound, the distance of the shot, the caliber of Kirkpatrick's weapon, and that money was stolen from the till. In addition, they both agreed that Kirkpatrick shot Ms. Robertson over beer. Furthermore, the store's register recorded one sale of less than a dollar, supporting Hawkins's claim that he purchased some water. And deputies noticed freshly brewed coffee, supporting Hawkins's claim that Ms. Robertson offered him coffee instead of beer. Finally, Kirkpatrick admitted, before asking for an attorney, that he was in the parking lot when the clerk was shot—an admission that substantially eroded his alibi defense.

We affirm.

HOUGHTON, C.J., concurs.

BRIDGEWATER, J., (concurring) — I agree that the officers violated CrR 3.1(c)(2), and I agree that if there was error, it

was harmless. The rights provided in CrR 3.1(c)(2) are not of constitutional origin, thus we apply the nonconstitutional harmless error test. *State v. Greer*, 62 Wn. App. 779, 790 n.4, 815 P.2d 295 (1991); *State v. Clark*, 48 Wn. App. 850, 863, 743 P.2d 822, *review denied*, 109 Wn.2d 1015 (1987). But I would not find error.

Jonathan Kirkpatrick clearly waived his right to counsel under *Miranda*[4] when he initiated conversation with the officers. *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981); *State v. Kaiser*, 34 Wn. App. 559, 563, 663 P.2d 839, *review denied*, 100 Wn.2d 1004 (1983). The State proved by a preponderance of the evidence that Kirkpatrick voluntarily, knowingly, and intelligently waived his right to counsel when he initiated conversation with the police and stated, "I don't need an attorney and I would like to continue to talk to you about the case."

Additionally, three factors are significant when considering if there was error: (1) no harm resulted from the officers' violation of CrR 3.1(c)(2) because no statement was made by Kirkpatrick at the officers' initiation, insistence, or suggestion before Kirkpatrick waived his right to counsel by initiating conversation; (2) Kirkpatrick did invoke his right to counsel, which demonstrated his intelligence and his knowledge and understanding of the right; and (3) the advice of counsel to invoke his rights, which the majority says he was denied, would have been redundant since that is precisely what he did.

Once Kirkpatrick waived his *Miranda* rights, he also waived his rights under CrR 3.1(c)(2). *State v. Wade*, 44 Wn. App. 154, 721 P.2d 977, *review denied*, 107 Wn.2d 1003

---

[4]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966).

(1986). Since there was a valid waiver, there was no error and no ineffective assistance of counsel.

Review denied at 135 Wn.2d 1012 (1998).