[No. 31245-6-I.   Division One.   February 6, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. GREGORY K. WHITE, *Appellant*.

*Andrew Subin* of *Washington Appellate Defender Association*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Rian Ebesugawa, Deputy*, for respondent.

AGID, J. — Gregory K. White appeals his conviction for possession of cocaine with intent to deliver in violation of RCW 69.50.401(a)(1)(i) on the ground that the trial court erred in denying his motion to suppress evidence. He also appeals a sentencing condition ordering him to stay out of identified drug trafficking areas. We affirm.

## I

### FACTS

On April 2, 1992, Seattle Police officer Michael Magee was participating in a "see-pop" operation near Third and Virginia. He was on the top floor of a parking garage using binoculars to look for drug activity on the street below. At 5:20 p.m., Magee saw White and another man, Marek Murray, walking along the sidewalk. When they reached the corner, the two men separated and stood 3 to 5 feet apart. After several minutes, a man wearing a white sweat suit approached White. The two spoke briefly, and White pointed to Murray. The man went to Murray, and they began walking slowly. White walked about 3 to 5 feet behind them. After a few steps, the man in the sweat suit took money from his pocket and counted it. Murray reached into his shorts and dropped something on the ground. The man in the sweat suit stopped, picked up the object, looked at it, put it in his mouth for a moment, and handed Murray money. When Murray and the other man stopped, White looked behind him over both shoulders. Shortly thereafter, Murray and the man in the sweat suit separated and began walking in opposite directions. White was walking ahead of Murray, but Murray eventually caught up. Magee saw "hand movements", but could not tell what, if anything, had passed between White and Murray.

Murray and White walked to Steve's Broiler on the corner of Fourth and Virginia. White went into the restaurant and Murray remained outside. At that point, Magee radioed for an arrest team for Murray and White. Officers Michael Pugel and Tom Henshaw responded. The officers testified that they saw a man outside Steve's Broiler, Murray, who matched one of the descriptions Magee had given. Henshaw arrested and searched Murray and found money and a pager. While Henshaw stayed with Murray, Pugel went inside Steve's Broiler and gave the manager a description of White. The manager told him that a man matching White's description had gone into the restroom. Pugel went into the restroom and saw one of the stalls occupied by someone wearing purple sweat pants

and brown shoes, the clothes Magee said one of the men was wearing. No one else was in the restroom.

Pugel walked to the stall and looked over the door. He saw White sitting on the toilet with his pants below his knees and currency lying on top of his underwear. Pugel told White he was under arrest and to come out with his pants down. When White emerged from the stall, Pugel immediately handcuffed him. Shortly thereafter, two transport officers came into the restroom. Pugel removed $103 from White's underwear and pulled up his pants. Pugel then searched White's jacket, which White had left in the toilet stall, and found $65, a pager, and 16 rocks of cocaine.

White moved pretrial to suppress this evidence. The motion was denied. A jury found White guilty as charged, and the trial court imposed a sentence within the standard range. As part of his sentence, the trial court ordered White to remain out of certain areas with a high incidence of drug trafficking.

## II
### MOTION TO SUPPRESS

#### A. Warrantless Arrest

■■ White contends that Pugel did not have probable cause to arrest him and that the evidence should have been suppressed on this basis.[1] "Probable cause for a warrantless arrest exists when facts and circumstances within the arresting officer's knowledge are sufficient to cause a person of reasonable caution to believe that a crime has been committed." (Citations omitted.) *State v. Huff*, 64 Wn. App. 641, 646, 826 P.2d 698, *review denied*, 119 Wn.2d 1007 (1992). Based on his narcotics training and experience, Magee testified that White's actions throughout the contact between Murray and the man in the white sweat suit were consistent with the actions of a lookout or setup person in a drug transaction.[2]

---

[1] White also contends that the officers did not have a reasonable suspicion sufficient to support a *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). However, because White was immediately placed under custodial arrest, the relevant inquiry is whether the officers had probable cause to arrest him, not whether they had reasonable suspicion to effect a *Terry* stop.

[2] Magee testified that he had witnessed hundreds of narcotics transactions.

These observations were sufficient to give Magee probable cause to believe that White had committed a crime. Under the fellow officer rule, Pugel had probable cause to arrest White based on Magee's observations. *See State v. Maesse*, 29 Wn. App. 642, 647, 629 P.2d 1349 (rule "permits probable cause to be determined upon the information possessed by the police as a whole when they are acting in concert"), *review denied*, 96 Wn.2d 1009 (1981). Accordingly, we reject White's argument that the evidence recovered as a result of his arrest should have been suppressed because Pugel lacked probable cause to arrest him.

### B. Warrantless Search

White next argues that the evidence should have been suppressed because Pugel conducted an unlawful search when he looked over the top of the toilet stall. In *Tukwila v. Nalder*, 53 Wn. App. 746, 770 P.2d 670 (1989), we held that an officer's act of looking into an enclosed toilet stall constitutes a search under article 1, section 7 of the state constitution because an enclosed toilet stall is an area in which a person has both a subjectively and an objectively reasonable expectation of privacy. *Nalder*, at 749-52.[3] We also held that the search in that case was unreasonable because it was a general exploratory search not based on any suspicion that a crime had been committed. Thus, under *Nalder*, Pugel's actions constituted a search because, by looking into the toilet stall, he intruded into an area in which White had a reasonable expectation of privacy. Unlike the search in *Nalder*, however, this search was not a general exploratory search because Pugel had probable cause to arrest White. The issue we must decide is whether a warrantless search of a toilet stall for a suspect whom an officer has probable cause to arrest is reasonable under the Fourth Amendment.

As a general rule, warrantless searches are per se unreasonable absent both probable cause *and* a justification

---

[3]In *Nalder*, we resolved this issue under article 1, section 7. However, we applied the 2-prong expectation of privacy analysis used to determine whether an intrusion constitutes a search under the Fourth Amendment. The parties here have confined their arguments to the Fourth Amendment, and we analyze this issue accordingly.

under one of the exceptions to the warrant requirement to effect the search. *State v. Bean*, 89 Wn.2d 467, 472, 572 P.2d 1102 (1978) (warrantless searches are per se unreasonable unless justified by one of the exceptions to the warrant requirement). The trial court held that Pugel's search was justified by exigent circumstances. A warrantless search may be justified by exigent circumstances, including the removal or destruction of evidence or a threat of danger to the police. *See State v. Goodin*, 67 Wn. App. 623, 838 P.2d 135 (1992). The State has the burden of establishing that the search falls into one of the exceptions to the warrant requirement. *State v. Lopez*, 70 Wn. App. 259, 268, 856 P.2d 390 (1993), *review denied*, 123 Wn.2d 1002 (1994).

Pugel testified that he conducted the search in order to prevent destruction of evidence and to protect officer safety. He further testified that, in his experience, people involved in drug transactions sometimes dispose of drugs by flushing them down the toilet. Pugel did not testify to any circumstances, however, to indicate that White was destroying evidence or that he was armed. There was no evidence, for example, that White was aware that he was being pursued by the police, thus there was nothing to indicate that he would attempt to destroy evidence or emerge from the stall with a weapon. Pugel's testimony was based solely on his observation that some people involved in drug transactions attempt to dispose of drugs. This is insufficient to support an objective belief that White was armed or that he was likely to destroy evidence. *See State v. Jeter*, 30 Wn. App. 360, 362, 634 P.2d 312 (1981) ("exigent circumstances must be based upon specific facts learned prior to execution of the warrant or observed at the scene" not "generalized speculation by law enforcement officers that their safety may be endangered or contraband destroyed"), *review denied*, 96 Wn.2d 1027 (1982). Thus, we hold that the trial court erred in concluding that Pugel's search of the stall was justified by a potential threat to officer safety or the possibility that White would destroy evidence.

■ Although we hold that the search was not justified by the exigent circumstances exception to the warrant require-

ment, we nonetheless conclude that it was reasonable under the Fourth Amendment. There are circumstances in which a strict application of the warrant requirement is both impractical and illogical.[4] In those instances, courts have held that probable cause to conduct a warrantless search is sufficient to satisfy the Fourth Amendment requirement of reasonableness.[5] This is such a circumstance. It is analogous to the hot pursuit exception to the warrant requirement which allows an officer to pursue a fleeing suspect into the most sanctified of all private spaces — the home. Although White was not fleeing because he did not know the police were pursuing him, Pugel was clearly justified in following him into the restroom and looking over the stall to make sure the person the manager identified was in fact the suspect he was following. Had he not done so, the suspect could have left while Pugel was waiting for a man whose shoes and pants matched the description to come out of the stall. We conclude that where, as here, the police have probable cause to believe that a crime has been, is being, or is about to be committed and that the suspect is in a toilet stall, it is reasonable to search the stall for that person notwithstanding the warrant requirement.

Our holding here strikes a balance between the reasonable expectation of privacy identified in *Nalder*[6] and society's interest in apprehending criminal suspects. In *Nalder* we were concerned primarily with the fact that evidence had been obtained through a general exploratory search, one that

---

[4]The parties read *Nalder* as creating a rule that warrantless searches of toilet stalls are per se unreasonable absent both probable cause and an exception to the warrant requirement. We agree that this is a fair reading of the case but believe that it goes farther than necessary to preserve reasonable expectations of privacy in toilet stalls.

[5]*See, e.g., State v. Muir*, 67 Wn. App. 149, 152, 835 P.2d 1049 (1992) (recognizing that, where it may be impractical to obtain a search warrant, exigent circumstances may exist and listing situations presenting such circumstances).

[6]Other jurisdictions have also recognized a reasonable expectation of privacy in enclosed toilet stalls. *See, e.g., Barron v. State*, 823 P.2d 17 (Alaska Ct. App. 1992); *People v. Morgan*, 200 Ill. App. 3d 956, 558 N.E.2d 524, *appeal denied*, 133 Ill. 2d 567 (1990); *People v. Mercado*, 68 N.Y.2d 874, 501 N.E.2d 27, 508 N.Y.S.2d 419 (1986), *cert. denied*, 479 U.S. 1095 (1987).

was not focused on anyone the officer had reason to believe was engaged in criminal activity *before* he looked into the stall. As such, the search "subjected the innocent, as well as the guilty, to unreasonable intrusions.' " (Citation omitted.) *Nalder*, at 752. In this case, Pugel had probable cause to believe that White was in the stall. When he entered the restroom, he observed that only one stall was occupied. Underneath the stall door, he saw shoes and pants matching the description of those worn by the suspect he was to arrest. Looking over the stall to ascertain whether the man in the stall was the suspect and to place White under arrest did not constitute an unreasonable intrusion on his privacy under these circumstances. Because the search was not unreasonable, it did not violate the Fourth Amendment. The trial court did not err in denying White's motion to suppress evidence.

## C. Inevitable Discovery

■ Even if Pugel's act of looking into the toilet stall were an unreasonable search, we would nonetheless uphold the trial court's denial of White's motion to suppress evidence because the evidence would have been recovered notwithstanding the allegedly unlawful search and would therefore be admissible under the inevitable discovery rule. The United States Supreme Court first recognized the inevitable discovery rule in *Nix v. Williams*, 467 U.S. 431, 81 L. Ed. 2d 377, 104 S. Ct. 2501 (1984). Under *Nix*, a court need not suppress evidence obtained from an illegal search or seizure if the State can establish that the evidence would have ultimately been discovered by lawful means. The inevitable discovery rule has not been formally adopted in Washington.[7] In our view, the circumstances in this case illustrate why

---

[7]Although the rule has not been explicitly adopted, several Washington cases have discussed it or referred to it. *See State v. Williams*, 102 Wn.2d 733, 748, 689 P.2d 1065 (1984) (Dimmick, J., dissenting); *State v. Broadnax*, 98 Wn.2d 289, 304, 654 P.2d 96 (1982) (Dolliver, J., dissenting); *State v. Feller*, 60 Wn. App. 678, 682, 806 P.2d 776 (declining to address the State's inevitable discovery argument because the rule had not been adopted in Washington), *review denied*, 117 Wn.2d 1005 (1991); *but see State v. Bartholomew*, 56 Wn. App. 617, 624, 784 P.2d 1276 (1990) (remanding for a hearing as to whether evidence was "inevitably discovered or admissible on other grounds"); *State v. Reid*, 38 Wn. App. 203, 209 n.6,

this jurisdiction should adopt it — had the initial search of the toilet stall been unconstitutional, the evidence recovered from the lawful search incident to arrest potentially would have been subject to suppression under the exclusionary rule. We do not consider this a result required by the Fourth Amendment.

We find Justice Dolliver's discussion of the doctrine in his dissent in *State v. Broadnax*, 98 Wn.2d 289, 304, 654 P.2d 96 (1982) particularly instructive and adopt it here. He proposed the following criteria for admitting evidence under the inevitable discovery rule:

> (1) The police did not act unreasonably or to accelerate the discovery of the evidence in question;[8] (2) proper and predictable investigatory procedures would have been utilized; and (3) those procedures would have inevitably resulted in the discovery of the evidence in question.

*Broadnax*, at 309. The State has the burden of proving that all three criteria are met. *Broadnax*, at 309.

Here, Pugel had probable cause to arrest White before he looked in the stall and had every intention of doing so when he went into the restroom to look for him. Had he waited for White to exit the stall to arrest him, the evidence would have been recovered through a routine search incident to arrest, a "proper and predictable investigatory procedure[ ]". *Broadnax*, at 309. We have determined in section II(B) above that Pugel's act of looking over the stall was not unreasonable under the circumstances. Thus, we conclude that all three of the *Broadnax* criteria would be met here and that the evidence would have also been properly admitted under the inevitable discovery rule.

687 P.2d 861 (holding, in dicta, that evidence would have been inevitably discovered and was therefore not subject to the exclusionary rule), *review denied*, 102 Wn.2d 1025 (1984).

[8]*Nix* specifically rejected an "absence of bad faith" requirement under the rule. *Nix*, 467 U.S. at 445. In his dissent in *Broadnax*, Justice Dolliver, citing *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), distinguishes between an absence of bad faith and a requirement that the State prove that the police did not act unreasonably. *Broadnax*, at 309.

## D. Strip Search

White further challenges the trial court's ruling on the ground that the police illegally searched him when they required him to spread his buttocks after he exited the stall with his pants down. However, this information was not before the trial court at the suppression hearing, and White cannot challenge the ruling on this basis. He also contends that Pugel violated RCW 10.79, the statute governing strip searches, by requiring him to exit the stall with his pants down. He does not indicate whether this argument was before the trial court or what bearing it may have had on his suppression motion. We agree that RCW 10.79 does not authorize strip searches incident to arrest. However, under the circumstances, the officer's actions were not unreasonable. Once White became aware of the officer's presence, there was a potential threat that White would attempt to retrieve a weapon from his clothing. Requiring him to exit the stall with his pants down was justified by the need for officer safety. Thus, neither argument is a sufficient ground on which to reverse the trial court's denial of his motion to suppress.

## III

### COMMUNITY PLACEMENT ORDER

The trial court ordered White to have no contact with areas designated as SODA (Stay Out of Drug Areas) zones by the West Precinct of the Seattle Police Department. White assigns error to this portion of the order on the ground that the trial court lacked authority to impose the condition under RCW 10.66. Under RCW 10.66.020, a court may enjoin a person identified as a known drug trafficker from an area it finds to be an area protected against drug trafficking (PADT area). RCW 10.66.010(3) defines a "[k]nown drug trafficker" as "any person who has been convicted of a drug offense . . . who subsequently has been arrested for a drug offense in this state". White argues that he could not be ordered to stay out of the drug areas because he had no prior drug offenses at the time of sentencing and was therefore not a known drug trafficker.

We reject White's argument because the court did not rely on RCW 10.66 in imposing the SODA order. Rather, it

ordered the condition under RCW 9.94A.120 as part of White's postrelease community placement. Under both the current version of RCW 9.94A.120 and the version under which White was sentenced,[9] offenders sentenced to a term of total confinement for particular crimes must receive 1 year of community placement as part of their sentences. The crimes include felony violations of the Uniform Controlled Substances Act, RCW 69.50, committed after July 1, 1988. RCW 9.94A.120(8)(b) lists conditions a trial court must impose as part of such an order. RCW 9.94A.120(8)(c) sets forth additional conditions a court may impose as part of its community placement order. Under RCW 9.94A.120(8)(c)(i), this may include an order that the offender "remain within, or outside of, a specified geographical boundary". Unlike RCW 10.66, there is no requirement under RCW 9.94A.120 that the defendant first be identified as a known drug trafficker. Thus, the fact that White did not have any prior felony drug offenses at the time of sentencing is immaterial. We hold that the trial court did not exceed its authority in imposing the SODA order under RCW 9.94A.120.

The conviction and sentence are affirmed.

GROSSE, J., and SCHOLFIELD, J. Pro Tem., concur.

Review granted at 127 Wn.2d 1017 (1995).

---

[9]White was sentenced in 1992 under the 1990 version of RCW 9.94A.120.