## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 30978-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| AARON LEROY BRIDEN, | ) | |
| | ) | UNPUBLISHED OPINION |
| Appellant. | ) | |

SIDDOWAY, A.C.J. — Aaron Briden appeals his conviction of aggravated first degree murder, second degree rape, and first degree robbery. He assigns error to the trial court's denial of his motion to suppress evidence traceable to a *Terry*[1] stop and to its consideration in a bench trial of a confession he made after first requesting a lawyer and then initiating renewed conversation with detectives. He argues that detectives failed to comply with the requirement of CrR 3.1(c)(2) that they provide him with access to the means necessary to put him in communication with a lawyer "[a]t the earliest opportunity."

---

[1] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

We find no error and affirm.

FACTS AND PROCEDURAL BACKGROUND

Just before 5 a.m. one morning in October 2009, the Yakima Police Department received a report that a woman had been found dead and naked in an alley. The victim was identified as Shelly Kinter. Detectives concluded based on her injuries that she had been raped, beaten, and later struck and run over by a car. The detectives searched surrounding areas for her clothing, which they found a few blocks away on a grass planting strip outside a Les Schwab tire location.

Within hours after Ms. Kinter's body was discovered, detectives visited businesses in the vicinity of her body and the clothing, hoping that any surveillance cameras might have captured video that would help in the investigation. They learned that a surveillance camera located on the roof of Yakima Neighborhood Health monitored the alley between it and the building housing Les Schwab, where the clothing was found. Video from the surveillance camera did help: it showed a car driving northbound down the alley that morning at 3:50 a.m. From footage showing a red glow from the vehicle's taillights, the detectives concluded that the car stopped just off camera, near where a janitor for Neighborhood Health had found the clothing. The video next showed a moving white light, consistent with a dome light or flashlight, and finally a resumed red taillight glow as the car presumably continued driving northbound up the alley.

2

After reviewing the video, detectives traveled to where Ms. Kinter had lived: a complex offering "clean and sober" housing for homeless individuals. In the parking lot, they saw a black 1998 Dodge Avenger that appeared to match the car seen in the surveillance video. Aside from a few scrapes on its front end, though, they found little evidence indicating that it had been involved in the homicide. To better determine whether the car in the lot was the car seen in the surveillance video, they captured a still photo from the video of the back end of the suspect car and brought the photo back to the parking lot to compare it to the Avenger. The detectives "felt really strongly" from the comparison that the car in the parking lot and the one in the photograph—both of which had unusual wrap-around taillights used on 1997 and 1998 model Avengers—were the same make and model. Report of Proceedings (RP) at 41.

As the detectives were preparing to impound the car in the parking lot for further investigation, another black Dodge Avenger, model year 1997, drove past them, heading down the street in front of the housing complex. As this second Avenger passed, the detectives noticed that its windshield appeared to be cracked or damaged on the driver's side. Detectives stationed in the lot informed Detectives Mark Andrews and Kasey Hampton, who were just arriving in their unmarked police vehicle, of what they had seen. Detectives Andrews and Hampton turned around and followed the second Avenger. After navigating so that they could view its front end, they saw that it had front-end damage and a damaged front windshield, which was consistent with it having recently

3

struck a person. They thereupon stopped the car, which was being driven by Mr. Briden, its sole occupant.

Upon approaching Mr. Briden and getting a closer look at the car, the detectives immediately saw indications that it had inflicted Ms. Kinter's vehicle-related injuries. Blood spots and smears were visible on the outside, and inside of the car a white Nike right shoe (an apparent mate to a shoe found on the planting strip) protruded from under the front seat into the right rear passenger floor area. Blood smear and a shock of dark curly hair that looked similar to Ms. Kinter's were seen on the undercarriage.

Mr. Briden was arrested and taken to the Yakima Police Department where, after being advised of his constitutional rights, he agreed to speak with Detectives Michael Nielsen and Chad Janis. He made no mention of wanting a lawyer until almost an hour into the interview. When he asked to speak to a lawyer, the detectives responded by stopping their questioning and rising to leave. After some further statements by Mr. Briden about whether he wanted a lawyer or wanted to talk to detectives, Mr. Briden asked if he could be put in his cell and the detectives left the interview room.

After he had been alone in the interview room for less than two minutes, Mr. Briden began knocking repeatedly on the door. When he had knocked several times, the detectives reentered the room and told Mr. Briden that if he wanted to talk they would listen. Mr. Briden resumed making statements. Although he initially denied killing Ms. Kinter, he later confessed.

4

Mr. Briden was eventually charged with aggravated first degree murder or alternatively felony murder, first degree kidnapping, and the first degree rape of Ms. Kinter. He was charged with first degree robbery of the Dodge Avenger from Cereilia Sinclair. The State charged him with deliberate cruelty aggravators on the felony murder, kidnapping, and rape counts.

The State's intent to offer Mr. Briden's confession came on for a CrR 3.5 hearing a few days before trial. Before the hearing, Mr. Briden filed a motion to suppress that and other evidence traceable to the vehicle stop. In support of his motion to suppress, Mr. Briden argued that the arresting officers lacked information sufficient to establish reasonable suspicion that he or the car he was driving had been involved in criminal activity and the investigatory stop was therefore unlawful.

At the time of a combined CrR 3.5 and 3.6 hearing, the parties also addressed the fact that Mr. Briden had requested a lawyer during his interview by detectives but had reinitiated conversation with them within moments after his request. The trial court ruled that "there was a clear request for an attorney, but . . . Mr. Briden reinitiated by his own accord to continue talking with the officers." RP at 255. It concluded that Mr. Briden's statements were admissible and denied his motion to suppress.

Part way through the jury selection process, Mr. Briden decided to waive jury trial and the case was tried to the court. The court found Mr. Briden guilty of aggravated first degree murder, second degree rape, and first degree robbery. He was acquitted of the

5

kidnapping charge and the deliberate cruelty aggravator was found only with respect to the murder count. As a result of his aggravated first degree murder conviction, Mr. Briden was sentenced to life in prison without the possibility of parole. He appeals.

## ANALYSIS

Mr. Briden challenges the trial court's decision to admit his confession and other evidence obtained from the *Terry* stop on two grounds. He argues, first, that detectives lacked an articulable suspicion that he was involved in Ms. Kinter's murder or other criminal activity and he was therefore stopped unlawfully. His second argument is that the trial court erred by not suppressing his confession in light of the detectives' failure to put him in communication with a lawyer in response to his request, in violation of CrR 3.1(c)(2). In challenging the trial court's decisions, Mr. Briden does not assign error to any of the findings included in the two sets of findings and conclusions entered on the CrR 3.5 and 3.6 issues. We treat those as verities. *State v. Tamblyn*, 167 Wn. App. 332, 336-37, 273 P.3d 459 (2012). At issue are only the trial court's conclusions of law, which we review de novo. *Id.*

We address Mr. Briden's two assignments of error in turn.

### I. Was the Terry stop unlawful?

The authority of officers to detain a suspect for an investigative *Terry* stop is well-settled. An investigative stop is permissible where police can "'point to specific and articulable facts which, taken together with rational inferences from those facts,

6

reasonably warrant that intrusion.'" *State v. Glover*, 116 Wn.2d 509, 514, 806 P.2d 760 (1991) (quoting *Terry*, 392 U.S. at 21). Under this exception to the warrant requirement, police may "briefly detain and question an individual" even if they lack probable cause to arrest so long as they have a "'a well founded suspicion based on objective facts that [the suspect] is connected to actual or potential criminal activity.'" *State v. Pressley*, 64 Wn. App. 591, 595, 825 P.2d 749 (1992) (internal quotation marks omitted) (quoting *State v. Tarica*, 59 Wn. App. 368, 375, 798 P.2d 296 (1990)); *Terry*, 392 U.S. at 25-26.

To determine the lawfulness of the stop, courts review whether the "initial interference with the suspect's freedom of movement [was] justified at its inception" and whether that interference was "reasonably related in scope to the circumstances which justified the interference in the first place." *State v. Tijerina*, 61 Wn. App. 626, 629, 811 P.2d 241 (1991) (citing *Terry*, 392 U.S. at 19-20). In evaluating reasonableness, courts look to "the totality of circumstances presented to the investigating officer." *Glover*, 116 Wn.2d at 514 (citing *United States v. Cortez*, 449 U.S. 411, 418, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)); *State v. Little*, 116 Wn.2d 488, 806 P.2d 749 (1991). They may consider factors such as the "officer's training and experience, the location of the stop, and the conduct of the person detained." *Pressley*, 64 Wn. App. at 596 (citing *Glover*, 116 Wn.2d at 514).

The "fellow officer" rule "permits probable cause to be determined upon the information possessed by the police as a whole when they are acting in concert" and need

not be based "solely upon the personal or subjective knowledge of the arresting officer." *State v. Maesse*, 29 Wn. App. 642, 647, 629 P.2d 1349 (1981). Most Washington cases applying the rule have done so in finding probable cause for arrest,[2] but the same reasons would justify applying the rule in finding reasonable suspicion for an investigative stop. If the initial stop is unlawful, the evidence obtained in the course of any subsequent search is inadmissible. *State v. Kennedy*, 107 Wn.2d 1, 4, 726 P.2d 445 (1986) (citing *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)).

Mr. Briden argues that the stop of the Avenger he was driving in the early afternoon following Ms. Kinter's murder was unlawful based on a series of appellate court decisions, some from Washington and some federal, which he characterizes as establishing the circumstances under which the investigatory stop of a car is lawful. He maintains that Washington courts have upheld investigatory stops of cars

> only where several of the following factors were present: (1) the occupants of the car matched the description of the suspects, (2) the car was followed from the scene of the crime, (3) the vehicle was only a few blocks from the scene of the crime, (4) the vehicle was being driv[en] at a high rate of

---

[2] *See, e.g., State v. Gluck*, 83 Wn.2d 424, 426-27, 518 P.2d 703 (1974) ("Probable cause exists where the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in a belief that an offense has been or is being committed."); *State v. White*, 76 Wn. App. 801, 805, 888 P.2d 169 (1995); *State v. Alvarado*, 56 Wn. App. 454, 456-57, 783 P.2d 1106 (1989) ("[C]ooperation between investigating officers or an arrest directive made by an officer possessing probable cause is sufficient to justify an arrest by an officer lacking knowledge of the facts which form the basis of probable cause.").

8

speed, and/or [5] the vehicle met a more specific [description] of the suspect vehicle.

Br. of Appellant at 8. He supports these allegedly exclusive criteria by citing *State v. Thornton*, 41 Wn. App. 506, 705 P.2d 271 (1985); *State v. Washington*, 4 Wn. App. 856, 484 P.2d 415 (1971); and *State v. Knutson*, 3 Wn. App. 495, 475 P.2d 887 (1970).

He contrasts these Washington decisions with federal cases holding that reasonable suspicion for a warrantless stop does not exist where an officer has no more information than that a car of a particular color was involved in a crime. He cites *United States v. Jaquez*, 421 F.3d 338, 340 (5th Cir. 2005) for the proposition that a car's color and general location is information too "sparse and broadly generic" to support an investigatory stop. He cites *United States v. Rias*, 524 F.2d 118 (5th Cir. 1975) for its conclusion that the mere presence of two black males in a black Chevrolet "clearly did not rise to the required level" of suspicion to support a stop to investigate recent robberies committed in the area by two black males in a black or blue Chevrolet.

Placing the facts of his case in the context of those decisions, Mr. Briden submits that "[i]n this case, the detectives were simply rolling the dice by searching every 'dark colored 2-door sedan' in the area." Br. of Appellant at 9. By any reasonable measure of the facts, this is a significant exaggeration.

The Washington cases that Mr. Briden cites do not purport to identify any exclusive list of facts supporting the investigatory stop of a vehicle. While some facts

9

present in the cases relied upon by Mr. Briden were not present here, this case involved other facts that collectively gave rise to reasonable suspicion.

Among facts found by the trial court that are verities on appeal were that Ms. Kinter appeared to have been run over by a car; specifically, there were skid marks near her body that appeared to consist of tissue ground into the pavement and her body was covered with oily dirt of the sort that accumulates on the undercarriage of a car. It appeared from the scene that the car that ran over her had reversed direction at some point. Detectives had found clothing apparently belonging to Ms. Kinter nearby; a janitor for Neighborhood Health told them he found the clothing in the path of cars entering and exiting the alley between Neighborhood Health and the neighboring Les Schwab location and moved the clothing to the grass strip. Review of video from the Neighborhood Health surveillance camera revealed the suspicious entry into the alley at 3:50 a.m. of the black car, whose driver the detectives reasonably suspected of leaving the clothing.

Critical to the officers' reasonable suspicion in this case was their substantial narrowing of the make and model of the suspect vehicle, accomplished in the early hours of the investigation. The detectives, who "were highly experienced and had expertise in automobile identification" knew from their initial review of the surveillance video that the car was a black American-made subcompact with distinctive wrap-around taillights consistent with manufacture by Chrysler or Dodge. Clerk's Papers (CP) at 167 (Finding of Fact 14). From the still shot captured from the video and from Internet research, the

detectives had concluded by midday that the car in the surveillance video was a 1997 or 1998 Dodge Avenger based on its taillight and backup light configuration and on its general shape.

When detectives preparing the first Dodge Avenger in the parking lot for impound saw the Avenger being driven by Mr. Briden, their suspicion was aroused not only by its windshield (cracked on the driver's side), but also by Detective Kellett's knowledge that a person who commits a crime will frequently monitor the police investigation, especially if he feels confident in his anonymity. There were several marked police cars in the housing complex lot at the time Mr. Briden drove by, making it apparent that police were conducting an investigation at the complex where Ms. Kinter had lived. Inasmuch as less than 12 hours had passed since Ms. Kinter's clothing had been left in the alley, there was reason to believe the perpetrator might be monitoring the investigation.

Finally, before stopping Mr. Briden, detectives followed and observed him long enough to see that the car he was driving had damage to the front end and to the front windshield and roof on the driver's side. This was consistent with their belief that the last injuries Ms. Kinter had sustained were caused by being struck, run over, and dragged by a vehicle.

The facts known to detectives provided a basis for suspicion that went well beyond a dark colored sedan seen in the general vicinity of the crime. The court's findings support its conclusion that the detectives had a sufficient basis for suspicion to

conduct a *Terry* stop of the car being driven by Mr. Briden.

The court found that following the stop and upon approaching Mr. Briden detectives immediately observed blood stains on the outside and inside of the car, damage to the front bumper and license plate and a large clump of hair and blood smears on the undercarriage. Those facts supported its conclusion that the duration and scope of the detention of Mr. Briden was justified.

The trial court did not err in denying Mr. Briden's motion to suppress.

> ## II. Should Mr. Briden's confession have been excluded based on the alleged violation of CrR 3.1(c)(2)?

Before conducting a custodial interrogation, police must advise the accused of his *Miranda*[3] rights. "If the accused requests an attorney, 'the interrogation must cease until an attorney is present.'" *State v. Wade*, 44 Wn. App. 154, 158, 721 P.2d 977 (1986) (quoting *Miranda*, 384 U.S. at 474), *abrogated in part on other grounds by In re Pers. Restraint of Carrier*, 173 Wn.2d 791, 272 P.3d 209 (2012). Washington criminal rules address the procedure to be followed by the State when a defendant in custody requests a lawyer. CrR 3.1(c)(2) provides:

> At the earliest opportunity a person in custody who desires a lawyer shall be provided access to a telephone, the telephone number of the public defender or official responsible for assigning a lawyer, and any other means necessary to place the person in communication with a lawyer.

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

As the court noted in *State v. Kirkpatrick*, CrR 3.1(c)(2) serves a different purpose than the *Miranda* warnings, which are merely "an important first step toward informing the person of the nature of his right to the assistance of counsel." 89 Wn. App. 407, 413-14 n.3, 948 P.2d 882 (1997) (citing AMERICAN BAR ASSOCIATION PROJECT ON MINIMUM STANDARDS FOR CRIMINAL JUSTICE, STANDARDS RELATING TO PROVIDING DEFENSE SERVICES § 7.1 cmt. d at 62 (Approved Draft, 1968)). Specifically, "CrR 3.1(c)(2) is designed 'to provide a meaningful opportunity to contact a lawyer.'" *Id.* at 413.

Courts have interpreted CrR 3.1(c)(2) to require that, when a person in custody requests access to a lawyer, police must make "reasonable efforts" to put the individual in contact with a lawyer. *Id.* at 414. "Although the rule does not require the officers to actually connect the accused with an attorney, it does require reasonable efforts to do so." *Id.*; *see also State v. Pierce*, 169 Wn. App. 533, 280 P.3d 1158, *review denied*, 175 Wn.2d 1025 (2012).

Mr. Briden argues that detectives took literally no action to put him into contact with a lawyer following what the trial court found was his clear request to speak to a lawyer.[4] The remedy for a violation of CrR 3.1 is "suppression of evidence tainted by the

---

[4] The State makes a threshold argument that we should decline to review this alleged error under RAP 2.5(a) because Mr. Briden failed to raise the issue below. While it may be true that it was not addressed in Mr. Briden's briefing, his request for a lawyer was the subject matter of examination and cross-examination in the pretrial hearing on issues under CrR 3.5 and 3.6 and it was raised during trial, albeit as a Sixth Amendment issue. The trial court clearly recognized Mr. Briden's request for a lawyer during

13

violation," *State v. Copeland*, 130 Wn.2d 244, 282, 922 P.2d 1304 (1996), and Mr. Briden argues that his evidence of his confession should have been excluded.

Mr. Briden reinitiated conversation with the detectives within minutes after asking if he could speak to a lawyer, however. *Miranda* and its progeny permit law enforcement officers to listen to statements volunteered by an accused after making a request for a lawyer. *Wade*, 44 Wn. App. at 159 (citing *Edwards v. Arizona*, 451 U.S. 477, 485, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981)). Whether Mr. Briden was entitled to the remedy of suppression in this case turns on whether his waiver of his right to counsel by reinitiating conversation with the detectives also operated as a waiver of the State's obligation under CrR 3.1(c)(2) to take reasonable steps to place him in contact with a lawyer.

The issue was examined in *Kirkpatrick*. There, the court recognized that a defendant can waive rights arising under court rules, including CrR 3.1(c)(2). "But because of the mandatory language of CrR 3.1(c)(2)," the court held, "an accused's waiver of the rule requires more than the State's noncompliance with the rule; it requires an accused's 'knowing, intelligent and voluntary conduct.'" 89 Wn. App. at 414-15 (quoting *State v. Nogueira*, 32 Wn. App. 954, 958, 650 P.2d 1145 (1982)). The court

---

questioning as an issue, addressing it directly in its findings and conclusions. Before a statement may be admitted against a defendant at trial, the State bears the burden of showing by a preponderance of the evidence that the defendant's waiver was knowing, voluntary, and intelligent. *State v. Athan*, 160 Wn.2d 354, 380, 158 P.3d 27 (2007). Its argument that the issue of its alleged violation of CrR 3.1(c)(2) was waived is not well taken.

found that the defendant, Kirkpatrick, did not waive his right where he requested an attorney several hours before confessing, "during normal working hours and at a police station, where presumably procedures exist for contacting defense counsel." *Id.* at 415. The State had shown no effort to contact an attorney during the available hours, why efforts could not have been made, or a valid waiver by Kirkpatrick before its earliest opportunity to assist him arose. Given the facts, there was every reason to believe that, had the officers acted on Kirkpatrick's request, he would have been placed in contact with a lawyer, whom the court "presume[d] . . . would have told Kirkpatrick to remain silent." *Id.* at 414.

The decision in *Kirkpatrick* distinguished this court's decision in *Wade*, in which the defendant was advised of his *Miranda* rights and requested a lawyer twice, immediately after police stopped him as a suspect. As the booking process was being completed, and less than an hour after he was stopped, Wade initiated conversations, signed a waiver, and confessed. As recognized in *Kirkpatrick*, the court in *Wade* "concluded that the defendant waived his 'right to counsel before the police had an opportunity to provide him with access to the phone and a list of attorneys who could possibly defend him.'" *Id.* at 415 (quoting *Wade*, 44 Wn. App. at 159).

In this case, it is undisputed that the detectives made no attempt to put Mr. Briden in contact with an attorney. But unlike *Kirkpatrick*, and even more clearly than in *Wade*, Mr. Briden voluntarily reinitiated conversation with the detectives before they could

15

reasonably have been expected to take action to put him into contact with a lawyer.

The facts surrounding Mr. Briden's confession are undisputed. At around 2:15 p.m., after being advised of his constitutional rights, he agreed to talk with the detectives and signed a form waiving his rights. Although he had not been forthcoming with inculpatory information, he had asked no questions about his constitutional rights and made no request for a lawyer before the detectives first left the interview room at 2:46 p.m. At 2:54 p.m., the detectives resumed the interview, and Mr. Briden made additional statements.

At 3:13:13 p.m.—nearly an hour after the interview began—Mr. Briden made his first and only reference to a lawyer. The trial court described the conversation that followed in its findings of fact:

> At 3:13:13 p.m. Mr. Briden said, "Man, can I speak to an attorney?" This was the only time Mr. Briden referred to an attorney. The court finds that this was an unequivocal request for counsel.
> The detectives stopped questioning and rose to leave.
> At 3:13:19 Mr. Briden asked, "So how long am I gonna be up in this mother fucker, man?" Then he asked, "Or can I talk to you guys?"
> "You just asked for an attorney," Detective Janis replied.
> "Well, can I talk to you guys instead?" Mr. Briden asked.
> "You just asked for an attorney," Detective Janis repeated.
> Mr. Briden asked if he could be put in a cell. This was not tantamount to a repeated request for counsel.
> The detectives exited the interview room at 3:13:33.

CP at 159.

16

Less than two minutes later, Mr. Briden began knocking at the door to the interview room. The trial court found that he first knocked at 3:14:16 p.m., repeated knocking at 3:14:28 p.m., and knocked again at 3:14:41 p.m. At some point before the detectives reentered the room, Sergeant Scott Levno, who was monitoring the interview, told Detectives Neilson and Janis "that if Mr. Briden wanted to resume talking it was permissible for them to re-enter the interview room and listen so long as they asked no questions." CP at 160.

A few seconds after Mr. Briden knocked for the third time, the detectives reentered the interview room. The trial court's findings of fact describe what happened next:

> The detectives entered the interview room at 3:14:47. Detective Janis told Mr. Briden, "If you want to tell us something, we'll listen to you."
> "So basically, I am looking at years, huh?" Mr. Briden asked.
> "We're here to listen to you now," Detective Janis told him. "We're done asking questions. You got something you want to tell us, we're here." The court finds that Detective Janis did not prompt Mr. Briden to resume speaking but correctly advised him that they would listen if he chose to speak.
> . . . .
> Mr. Briden resumed making statements. Almost immediately, at 3:15:56, Mr. Briden said, "I took that car. I ran her over, man. That's all that happened."
> The detectives asked follow-up questions for clarification, which Mr. Briden voluntarily answered.

CP at 160-61. At 3:23:23 p.m., a little more than an hour after the interview began, the detectives ended the interview and Mr. Briden was taken to a holding cell.

17

Mr. Briden characterizes the detectives' conduct as calculated and argues that they left him in the interview room

> with no information about whether they would ever connect him with an attorney. In response, [he] naturally panicked and re-initiated contact with the detectives, assuming that the detectives were not going to make "reasonable efforts" to connect him with an attorney.

Br. of Appellant at 18. Given this allegedly improper intent, he argues that the conduct of the detectives was equivalent to that of law enforcement officers in *Kirkpatrick* and *Pierce* who ignored their obligations under the rule for several hours, eventually resulting in the defendants' giving up on their request for a lawyer and confessing.

Mr. Briden made a similar argument during the pretrial hearing, arguing that the detectives had "strategized" and were "crafty" in their dealings with Mr. Briden. The trial court rejected that characterization of the evidence, stating, "We don't have a situation where Mr. Briden has been, the court's words, chilled out in a room for an hour, left on his own, you know, to the point where he's begging to get out of the room to talk to someone." RP at 254. Instead, characterizing the time frames as "compelling," the trial court found that

> Mr. Briden's persistent knocking on the door demonstrated his desire to reinitiate conversation with the police and continue telling them what he knew about the incident. Mr. Briden was in the interview room alone for one minute and fourteen seconds. The police did not prompt or coerce Mr. Briden to reinitiate conversation by isolating him for a long time. There is no indication that the police subtly motivated Mr. Briden to reinitiate conversation. The court finds that Mr. Briden reinitiated conversation with

18

the detectives under *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed. 378, 101 S. Ct. 1880 (1981).

CP at 160.

The trial court's findings are, again, unchallenged, and therefore verities. *Kirkpatrick*, discussing *Wade*, recognized that an hour was not sufficient time for officers to have placed a defendant in contact with a lawyer and that the defendant's reinitiation of conversation with officers within that one-hour time frame operated as a waiver of the officers' obligations under CrR 3.1(c)(2). By voluntarily reinitiating conversation within less than two minutes of asking to speak with a lawyer, Mr. Briden even more clearly waived the detectives' responsibility to take further action under CrR 3.1(c)(2).

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.090.

_____
Siddoway, A.C.J.

WE CONCUR:

_____
Kulik, J.P.T.

_____
Fearing, J.

19