FILED
JULY 7, 2015
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31940-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GRANT WAYNE SCANTLING, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Grant Scantling appeals his conviction of first degree burglary and aggravated first degree murder, assigning error to evidentiary rulings by the court, ineffective assistance of counsel, and prosecutorial misconduct. He also challenges the trial court's findings and order relating to legal financial obligations. We find no error or abuse of discretion and affirm.

FACTS AND PROCEDURAL BACKGROUND

Grant Scantling was convicted of first degree burglary and aggravated first degree murder after he broke into the Kennewick home of his former girlfriend, Ann Marie Krebs, and shot and killed Franklin Palmer, who was one of three adults living in the home at the time.

Mr. Scantling and Ms. Krebs, who had been romantically involved for six years and have two young children together, had broken up around Thanksgiving 2012, approximately four months before the shooting. Before they broke up, Mr. Scantling, Ms. Krebs, their two children, and Ms. Krebs's son from another relationship, lived together at the Kennewick home. Mr. Palmer and Michael Billado, friends of Mr. Scantling and Ms. Krebs, also lived there occasionally.

Following the breakup with Ms. Krebs, Mr. Scantling moved into his mother's house, located a few blocks away. The children remained with Ms. Krebs.

Around Christmas time, Ms. Krebs went to see Mr. Scantling at his mother's house and during the course of their conversation, told him that a couple of weeks after they had broken up, she had sexual relations with Mr. Palmer. Mr. Scantling responded that he was going to "kick [Mr. Palmer's] butt;" proceeded to Ms. Krebs's home, where Mr. Palmer was staying; assaulted him; and told him to "get the fuck out." Report of Proceedings (RP) (Sept. 9, 2013) at 176, 250. Mr. Billado witnessed the assault.

Shortly after Christmas, Mr. Scantling moved to Spokane, where he stayed with his brother-in-law. He was living there at the time of the shooting.

On March 19, 2013, three days before the shooting, Mr. Scantling borrowed his brother-in-law's car and drove to Kennewick. According to Mr. Scantling, he had finally saved enough money to pay for gas and take his children to lunch, and was anxious to see them since he had not visited since around New Year's. Unbeknownst to Mr. Scantling,

2

Ms. Krebs was packing up her and the children's belongings, on the verge of moving to Michigan. She was surprised at Mr. Scantling's arrival and he was surprised and upset at signs she was moving. She slammed the door upon seeing him, closed the curtains, and refused him entry

Mr. Scantling returned to Spokane and over the next several days wrote out (but did not mail) enraged letters—this despite a text message Ms. Krebs had sent him late in the day on March 19, apologizing for her actions. Among his angry ruminations were the following:

> What a cunt. You bitch. I'm going to kill you for that. What was she afraid of? I wasn't this guy til now. You're going to reap a whirlwind. Or maybe I was that guy and it took Ann to bring it out. The demon is loose.

RP (Sept. 6, 2013) at 254.

> 3-19, 2013 She pulled the curtains so I couldn't even see them. They didn't see me. What did she tell them? Michael saw me, not my babies. What a cunt!!!!! You bitch, I'm gonna kill you for that.

*Id.* at 383.

> She has gone too far!!! She could have prevented this day by simply letting me hug my children. I would have been comforted, come home, went to work. But, no. Ann had to perpetuate her tough bitch bullshit.
> This last act of ignorance has backed me into a corner. I am destroyed, annihilated and tortured inside as the thought of her continuing to use [the children] against me like this. I won't stand for it.

*Id.* at 378-79.

> [S]he was the only woman I ever loved. She didn't deserve the way I treated her, but she does now. My love for her is dead. That's not true, I

3

love her to death, that's why this hurts so much. If only she would drop the lies and APOLOGIZE. But, no. A cunt is as a cunt does. I apologize to everyone but Ann for the pain plus heartache that this day is going to cause. I'm already gonna burn in hell, God have mercy on me.

*Id.* at 379-80.

[I]f I fail, Ann will never learn that you can't treat me that way, and get away with it. And she will go about her way full of pride, saying "serves him right" looser. No, not this time bitch. Options. 1. Off Myself 2. Set things right. I choose #2 Run rabbit run.

*Id.* at 376-77.

Early in the morning on March 22, Mr. Scantling, who later told police he had hardly slept in the prior 72 hours, again drove from Spokane to Ms. Krebs' home—this time taking his brother-in-law's car and handgun without permission. In Kennewick, Ms. Krebs's children's beds had been taken apart for the move, so all three children were sleeping with her. She and the children awoke to the sound of shattering glass. Mr. Scantling had thrown a cinder block through the sliding glass door of Ms. Krebs' bedroom.

After entering through the broken glass door, Mr. Scantling put his hand around Ms. Krebs' neck, choking her, and held a gun to her forehead. He screamed at her about not taking his children, yelling, "This wouldn't have happened if you would have let me see my kids." RP (Sept. 9, 2013) at 133.

Mr. Billado and Mr. Palmer were both staying at the home and on hearing the commotion headed for Ms. Krebs's bedroom. Mr. Billado later testified that he entered

4

first and asked, "What the fuck you doing, Grant?" RP (Sept. 9, 2013) at 134. According

to Mr. Billado, Mr. Scantling turned toward the two men, responded "Fuck you," and

"Fuck you, Frank," and then shot in their direction. *Id.* Mr. Billado ducked, took off

down the hallway, and ran outside, where he called 911. Mr. Palmer was hit.

According to Ms. Krebs, Mr. Palmer was felled by the first shot and lay

motionless, partially in a closet off the hallway. Mr. Scantling walked over to him and

shot him at close range a second time. An autopsy revealed that Mr. Palmer was shot

three times, twice at close range.

Mr. Scantling then moved to the living room; Ms. Krebs initially waited but then

followed him in. After he pushed her into furnishings assembled for the move, he told

her he had "one bullet for you and one for myself," and then held the gun to his head for

a moment before lowering it and leaving. *Id.* at 241. As Mr. Scantling drove from the

home, he saw Mr. Billado and yelled, "That's what happens when you fuck with

someone's wife." *Id.* at 139. Mr. Scantling returned to Spokane, where he was arrested

later in the day.

During a police interview, Mr. Scantling made several voluntary statements to the

detectives before requesting an attorney, including that Mr. Palmer had slept with Ms.

Krebs shortly after they separated, and "consciously drove a wedge" between the two of

them that was "very difficult to deal with." Clerk's Papers (CP) at 179. He also spoke

repeatedly about Ms. Krebs's actions three days earlier, volunteering that he had only

5

slept about one and a half hours since. He said he was having "some real hard problems digesting and dealing with that door being slammed in my face and I went back down this morning, just wanted to see my kids, man. And he shouldn't have been there." CP at 180.

Execution of a warrant to search the Spokane home where Mr. Scantling had been staying yielded the incriminating letters he had written.

Before trial, the State moved for an order that evidence of Mr. Scantling's prior assault and threats against Mr. Palmer were admissible under ER 404(b). It contended that the prior assault was admissible to show the absence of mistake or accident, motive, disposition, and the relationship between Mr. Scantling and Mr. Palmer. It also argued the evidence was admissible to rebut a claim of self-defense that Mr. Scantling initially asserted but later abandoned. The trial court ruled the evidence admissible.

With two adult eyewitnesses and three child witnesses to the crime, Mr. Scantling did not contest his liability for first degree burglary or murder at trial. The entire defense effort was devoted to persuading the jury that his shooting of Mr. Palmer was not premeditated and that he was guilty of only second degree murder.

The jury was not persuaded and found Mr. Scantling guilty as charged. It returned a special verdict that "[t]he murder was committed in the course of, in furtherance of, or in immediate flight from a burglary in the first degree." CP at 146. Mr. Scantling was sentenced to life in confinement without the possibility of parole. He appeals.

6

ANALYSIS

Mr. Scantling makes six assignments of error on appeal. His first and second are that the court erred in admitting evidence of his threat and prior assault against Mr. Palmer. His third is that he received ineffective assistance of counsel when his trial lawyer failed to object to the handwritten letters seized in the search of his Spokane home. His fourth is that the prosecutor committed misconduct in opening statement and closing argument. His fifth and sixth are to the trial court's finding of ability to pay legal financial obligations and imposition of costs. We address the assignments of error in that order.

*Evidence of Threat and Prior Assault Against Mr. Palmer*

Because the State charged Mr. Scantling with first degree premeditated murder, it needed to offer evidence that Mr. Scantling's killing of Mr. Palmer had been "thought over beforehand," as explained by the court's instructions. CP at 134 (Instruction 21). To that end, it moved before trial for a ruling that evidence of Mr. Scantling's prior threat against Mr. Palmer and the December assault were admissible under ER 404(b). The motion was not argued, however, until Mr. Billado was called as a witness.

Out of the presence of the jury, Mr. Billado was questioned about the assault. The State then argued that the testimony was admissible for the permitted purpose of proving Mr. Scantling's motive and intent in killing Mr. Palmer as well as rebutting Mr. Scantling's claim of self-defense. It asserted that the prior assault shows motive "because

7

we have the same motive back then that we have here" and that no other evidence

provided a clearer picture of Mr. Scantling's state of mind in entering Ms. Krebs' home

and shooting Mr. Palmer. RP (Sept. 9, 2013) at 166.

The court initially ruled that the evidence was admissible to rebut Mr. Scantling's

theory of self-defense. Following a noon recess, however, Mr. Scantling's lawyer asked

if the court would still find the evidence admissible if Mr. Scantling abandoned that

defense. The court responded:

> THE COURT: . . . [I]n response to [defense counsel's] questions, I did
> indicate that the self-defense was—and I did actually in the sidebar, too,
> bring up the fact that the defense had opened it up to—I thought by
> asserting self-defense. If you take out the self-defense, *I think I would rule
> the same way based on the representations, rather than reciting them
> again, that [the State] made.*

*Id.* at 172 (emphasis added). Mr. Scantling argues that the trial court committed both

procedural and substantive error in admitting evidence of his prior assault of Mr. Palmer.

The process to be followed by a trial court in determining whether evidence of

prior crimes or wrongs is admissible under ER 404(b) is well settled. The trial court must

"'(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify

the purpose for which the evidence is sought to be introduced, (3) determine whether the

evidence is relevant to prove an element of the crime charged, and (4) weigh the

probative value against the prejudicial effect.'" *State v. Foxhoven*, 161 Wn.2d 168, 175,

163 P.3d 786 (2007) (quoting *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)).

8

It must conduct this analysis on the record. *Foxhoven*, 161 Wn.2d at 175. "Failure to do so precludes the trial court's 'thoughtful consideration of the issue', and frustrates effective appellate review." *State v. Smith*, 106 Wn.2d 772, 776, 725 P.2d 951 (1986) (quoting *State v. Jackson*, 102 Wn.2d 689, 694, 689 P.2d 76 (1984)). A trial court's ruling under ER 404(b) is reviewed for abuse of discretion. *State v. DeVincentis*, 150 Wn.2d 11, 17, 74 P.3d 119 (2003).

Mr. Scantling argues, correctly, that the trial court failed to perform two steps of the required analysis on the record: identification of the permitted purpose for the evidence, and the ER 403 balancing. He also argues that substantively, neither a proper purpose nor probative value exceeding undue prejudice were demonstrated by the State.

"[I]f the record shows that the trial court adopted one of the parties' express arguments as to the purpose of the evidence and that party's weighing of probative and prejudicial value, then the trial court's failure to conduct its full analysis on the record is not reversible error." *State v. Asaeli*, 150 Wn. App. 543, 576 n.34, 208 P.3d 1136 (2009). "[W]here a trial court rules on the admissibility of ER 404(b) evidence immediately after both parties have argued the matter and the court clearly agrees with one side, an appellate court can excuse the trial court's lack of explicit findings." *State v. Stein*, 140 Wn. App. 43, 66, 165 P.3d 16 (2007). Here, the court's explicit statement following argument that it would admit the evidence "based on the representations, rather than reciting them again, that [the State] made" adequately demonstrates its determination that

the prior assault was admissible for the reasons argued by the State. RP (Sept. 9, 2013) at 172.

Evidence of the prior assault was admissible to show both motive and intent. "Motive, for purposes of the admissibility of evidence under ER 404(b), 'goes beyond gain and can demonstrate an impulse, desire, or any other moving power which causes an individual to act.'" *State v. Baker*, 162 Wn. App. 468, 473-74, 259 P.3d 270 (2011) (quoting *State v. Powell*, 126 Wn.2d 244, 259, 893 P.2d 615 (1995)). The court in *Baker* distinguished *State v. Saltarelli*, 98 Wn.2d 358, 359, 655 P.2d 697 (1982), in which evidence of a defendant's prior assault on a woman was deemed not relevant to his motive for raping a different woman nearly five years later. It noted that, unlike in *Saltarelli*, the defendant's prior assaults "were on the same victim as the assaults with which he was charged and that the assaults were but months apart." *Baker*, 162 Wn. App. at 474. Here, Mr. Scantling assaulted Mr. Palmer less than three months before the murder.

The evidence is also admissible to show intent. "'[E]vidence of quarrels between the victim and the defendant preceding a crime, and evidence of threats by the defendant, are probative upon the question of the defendant's intent.'" *Powell*, 126 Wn.2d at 261 (quoting *State v. Parr*, 93 Wn.2d 95, 102, 606 P.2d 263 (1980)). This evidence is particularly relevant where, as here, "malice or premeditation is at issue." *Id.* at 261. "'Such evidence tends to show the relationship of the parties and their feelings one

toward the other, and often bears directly upon the state of mind of the accused with consequent bearing upon the question of malice and premeditation.'" *Id.* at 261-62 (quoting *State v. Davis*, 6 Wn.2d 696, 705, 108 P.2d 641 (1940)).

Although the trial court erred in failing to weigh prejudice on the record, evidentiary errors under ER 404 are not of constitutional magnitude. *State v. Jackson*, 102 Wn.2d 689, 695, 689 P.2d 76 (1984). They are therefore harmless if, within reasonable probabilities, the outcome of the trial would not have been different if the error had not occurred. *Id.* The failure to weigh prejudice on the record can be harmless, among other cases, "when the record is sufficient for the reviewing court to determine that the trial court, if it had considered the relative weight of probative value and prejudice, would still have admitted the evidence." *State v. Carleton*, 82 Wn. App. 680, 686, 919 P.2d 128 (1996).

There is no reason to believe that the trial court would have reached a different result had it conducted an ER 403[1] balancing analysis. "Nearly all evidence is prejudicial in the sense that it is offered for the purpose of inducing the trier of fact to reach one conclusion and not another. This is *not* the sense in which the term 'prejudice' is used in Rule 403." 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND

---

[1] ER 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

11

PRACTICE § 403.3, at 440 (5th ed. 2007). Yet this is the only sense in which Mr.

Scantling can seriously argue he was prejudiced by the evidence.

Mr. Billado testified that the prior assault consisted of Mr. Scantling merely hitting

Frank with his fist and telling him to get out of the house:

> A     . . . [T]he defendant came through barging through the door upset.
> Q     Did he knock on the door or—
> A     No.
> Q     And what happened after he barged in the door?
> A     Him and Frank got into a confrontation, argument. Well, it wasn't much of an argument. Frank was sleeping, too, and the defendant was pretty upset, . . .
> . . . .
> A     He was hitting Frank.
> Q     And how was he hitting Frank?
> A     With his fist.
> Q     And do you remember where on Frank's body he was hitting him?
> A     Upper—from his chest up.
> Q     And what did Frank do after the defendant hit him?
> A     Put up a guard to stop the defendant from hitting him, and the defendant backed off and told Frank to, "Get the fuck out of the house."
> Q     And what did Frank do then?
> A     Got up and walked out.
> Q     And what did the defendant do?
> A     Sat there and calmed down.
> Q     And did you hear the defendant say anything else during that time period?
> A     No.

RP (Sept. 9, 2013) at 175-76.

12

The jury would later learn from Ms. Krebs and from the statement Mr. Scantling gave to police that Mr. Scantling committed the assault upon learning that Mr. Palmer, whom he had considered a friend, had sexual relations with Ms. Krebs within a couple of weeks after she and Mr. Scantling broke up. Jurors were unlikely to view evidence of a fist fight under such circumstances as unduly prejudicial evidence that Mr. Scantling was a "criminal type." *State v. Lough*, 125 Wn.2d 847, 853, 889 P.2d 487 (1995) (purpose of ER 404(b) is to prevent the use of evidence of prior misconduct "to show that a defendant is a 'criminal type', and is thus likely to have committed the crime for which he or she is presently charged").

The evidence did, however, have a tendency to make it more probable that Mr. Scantling would intentionally harm Mr. Palmer in March 2013 than it would be without the evidence—the test of relevance under ER 401.[2]

Mr. Scantling also argues the trial court erred when it allowed the State to question Ms. Krebs about a prior threat he had made towards Mr. Palmer, eliciting the following testimony:

---

[2] Citing *State v. Thang*, 145 Wn.2d 630, 41 P.3d 1159 (2002), Mr. Scantling argues that the error in admitting the evidence was exacerbated by the State's mention of the assault in its rebuttal closing argument. But in *Thang*, the court held that the evidence had been admitted for an improper purpose, hence "exacerbating" the error by repeating it. Here, the evidence of Mr. Scantling's prior assault of Mr. Palmer was admissible for the proper purposes already discussed, so the State's remarks during closing argument did not "exacerbate" any error.

> Q       Were there any times when the defendant threatened Frank in a conversation with you?
>
> A       Let me—yes is the answer, but I mean I can't remember exactly when.
>
> Q       Okay.
>
> A       A couple weeks before.
>
> Q       Tell us what he said.
>
> A       He just said that he was going to kick his butt, basically, I guess.
>
> Q       And was this before—did you ever tell Grant Scantling that you had at least some sort of romantic or physical relationship with Frank?
>
> A       At one time I did, and I told him that after we broke up.
>
> Q       And was the defendant's threat to kick Frank's butt, was it before or after you told that to Grant?
>
> A       It was after.

RP (Sept. 9, 2013) at 249-50. These questions were posed after the State persuaded the trial court that Mr. Scantling's lawyer opened the door to testimony about the threats through his own questioning.[3]

It was the following questions about text messaging between Ms. Krebs and Mr. Scantling that the State argued opened the door:

> Q       Mr. Miller asked you about the text messages you had sent to Mr. Scantling between the 19th and the 22nd when this happened. Had Grant responded to you during those text messages?
>
> A       Uh-uh, no.
>
> Q       Do you recall the officers in your second interview asking about the text messages?
>
> A       Yes.

---

[3] In a pretrial hearing, the State acknowledged it was not entitled to introduce the evidence of prior threats without first getting permission from the court.

Q     And you told the officers that he was texting?

A     Yeah. He was texting before that.

Q     Okay.

A     And I sent one text right before he showed up that, "We can't fool ourself. This isn't going to work," things like that, and that was the only text I sent him, and then two days later, he showed up.

Q     Okay. And none of the texts that he sent you were threatening Frank in any way?

A     No.

Q     None of them said, "I'm going to kill Frank"?

A     No, not at all.

*Id.* at 245-46.

> To close the door after receiving only a part of the evidence not only leaves the matter suspended in air at a point markedly advantageous to the party who opened the door, but might well limit the proof to half-truths. Thus, it is a sound general rule that, when a party opens up a subject of inquiry on direct or cross-examination, he contemplates that the rules will permit cross-examination or redirect examination, as the case may be, within the scope of the examination in which the subject matter was first introduced.

*State v. Gefeller*, 76 Wn.2d 449, 455, 458 P.2d 17 (1969). Courts often characterize the issue as one of waiver, stating "that any objection to the explanatory or contradictory evidence is waived because the evidence was 'invited,' or because the objecting party was the first to 'inject the issue' into the trial." 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 103.15, at 80-81 (5th ed. 2007).

Mr. Scantling contends that his lawyer's questioning was limited to text messages in the days surrounding the shooting and the State's redirect examination should have been similarly constrained. The State argues that by limiting the manner of

communication and timeframe, the defense could have left the jury with the impression that Mr. Scantling never threatened Mr. Palmer at all.

A trial court has wide discretion in determining the scope of redirect examination and whether to admit or exclude evidence, and the appellate court will not reverse absent a manifest abuse of that discretion. *State v. Gallagher*, 112 Wn. App. 601, 609, 51 P.3d 100 (2002). A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds or reasons. *Id.* Here, a reasonable court could conclude that if the State were not allowed to ask Ms. Krebs about threats made at other times or in other ways, the defense "would have succeeded in painting a false picture" that no such threats were made. *Id.* at 610; *see also Ma'ele v. Arrington*, 111 Wn. App. 557, 560, 45 P.3d 557 (2002) (defendant left impression that the plaintiff had fully recovered from his injuries by presenting evidence that he had discontinued his medical treatment); *State v. Price*, 126 Wn. App. 617, 642, 109 P.3d 27 (2005). We find no abuse of discretion.

### Ineffective Assistance of Counsel

Mr. Scantling next contends he was denied effective assistance of counsel because his defense attorney failed to object to the admission of the handwritten letters police

found following his arrest.[4] He argues that his attorney's failure to object amounts to ineffective assistance of counsel because the letters were irrelevant and unfairly prejudicial. To prevail on a claim for ineffective assistance of counsel, the defendant must prove both (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Nichols*, 161 Wn.2d 1, 8, 162 P.3d 1122 (2007).

Deficient performance is that which falls "below an objective standard of reasonableness based on consideration of all the circumstances." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). "The threshold for the deficient performance prong is high, given the deference afforded to decisions of defense counsel . . . [t]o prevail . . . a defendant alleging ineffective assistance must overcome 'a strong presumption that counsel's performance was reasonable.'" *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011) (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). "When counsel's conduct can be characterized as legitimate trial strategy or

---

[4] Mr. Scantling also states that his lawyer deficiently failed to object to evidence of the events of March 19. His argument in support of his ineffective assistance claim relates only to admission of the letters, however. This court will not address asserted errors that are unsupported. RAP 10.3; *Spokane Research & Defense Fund v. W. Cent. Cmty.*, 133 Wn. App. 602, 606, 137 P.3d 120 (2006) (declining to analyze contention for which appellant provided no reasoned argument, reference to the record, or legal authority supporting its argument).

tactics, performance is not deficient." *Kyllo*, 166 Wn.2d 863. Prejudice exists if the

defendant can show that "there is a reasonable probability that, but for counsel's

unprofessional errors, the outcome of the proceeding would have been different."

*Nichols*, 161 Wn.2d at 8.

In this case, Mr. Scantling's lawyer's decision not to object to the admission of the

handwritten letters can clearly be characterized as legitimate trial strategy. As earlier

observed, the entire defense effort was devoted to persuading the jury that Mr.

Scantling's actions on the night of the murder were not motivated by any premeditated

intent directed at Mr. Palmer but instead by his rage at Ms. Krebs. While the notes

portrayed Mr. Scantling in a negative light, his readily provable acts were going to

portray him in a negative light anyway. More important was the value of the notes in

casting doubt on Mr. Palmer being the object of Mr. Scantling's criminal intent on the

morning of the crime. As Mr. Scantling's own lawyer argued in closing:

> The letters. They were kind of interesting. The State showed
> you—I'm not going to go through them all, but the State showed you
> two—two of the—or two and a half of the letters—*and you'll go through
> them all*—and picked out the worst parts, but *I ask you to please look at
> these carefully* and see if in any of these letters, the one, two, three and then
> there's—there's the one that the State didn't show you for whatever
> reason—well, because the kids are mentioned. Because the kids are
> mentioned. *So I want you to look at these*, and whether the kids are
> mentioned or not, *the important thing of all these letters, one, two, three
> and four, is guess who's not mentioned? Frank Palmer or Michael Billado.*
> In these writings that Grant did—and we've never denied he did the
> writings. . . .

> . . . [T]hey are horrible letters, but what they aren't is evidence of premeditation. They are not evidence of premeditation for killing Frank Palmer.
> . . . *[N]one of the letters, none of the letters even mention, even by inference, mention Frank Palmer or Michael Billado. So is there any evidence of premeditation there? No.*

RP (Sept. 11, 2013) at 418-20 (emphasis added).

Mr. Scantling's lawyer's urging the jurors to focus on the letters demonstrates that he chose not to object to their admission for tactical reasons. No ineffective assistance of counsel is shown.

## Prosecutorial Misconduct

Mr. Scantling next contends that the prosecutor committed misconduct in making three arguments that improperly appealed to the passion and prejudices of the jury and in vouching for the credibility of a witness.

A defendant claiming prosecutorial misconduct bears the burden of proving "'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008) (quoting *State v. Hughes*, 118 Wn. App. 713, 727, 77 P.3d 681 (2003)). A failure to object to a prosecutor's improper comment at trial constitutes waiver of the objection on appeal unless the misconduct "'is so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a

curative instruction to the jury.'" *State v. McKenzie*, 157 Wn.2d 44, 52, 134 P.3d 221

(2006) (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)).

*Justice for the victim and community.* Mr. Scantling first argues that the

prosecutor committed misconduct by saying during opening statement that

> [o]ur role in this case is to seek justice. And we'll hear the evidence that
> will give you the tools to come back with a verdict that will give justice to
> Franklin Palmer and give justice to our community. And that verdict will
> be that the defendant is guilty.

RP (Sept. 5, 2013) at 255. The prosecutor similarly stated in closing argument that

"[t]his trial is seeking justice for Mr. Palmer, for our community, and to hold the

defendant accountable." RP (Sept. 11, 2013) at 410. Mr. Scantling did not object to the

statements at trial but now characterizes them as urging the jury to convict based not on

the evidence, but on its sympathy for Mr. Palmer.

Mr. Scantling cites only two cases in support of his claim that these remarks

improperly appealed to the jury's passions and prejudices: *State v. Fisher*, 165 Wn.2d

727, 202 P.3d 937 (2009) and *State v. Claflin*, 38 Wn. App. 847, 690 P.2d 1186 (1984).

Neither supports a finding of prosecutorial misconduct in this case.

In *Fisher*, the prosecutorial misconduct found was in referring to evidence the

court had ruled was only conditionally admissible, where the condition supporting its

admission never occurred. It was not the type of argument made by the prosecutor but

the evidence improperly brought to the attention of the jury that constituted reversible error.

In *Claflin*, the prosecutor closed with argument that included a poem by an anonymous rape victim "utilizing vivid and highly inflammatory imagery in describing rape's emotional effect on its victims." 38 Wn. App. at 850. Although the court acknowledged that "reference to the heinous nature of a crime and its effect on the victim can be proper argument," it held that the poem contained allusions to matters outside of any evidence presented and was "nothing but" an appeal to the jury's passion and prejudice. *Id.* at 849-50.

The prosecutor here did not tie his mention of "justice" to some improper basis on which he was asking the jury to find guilt. "Urging the jury to render a just verdict that is supported by evidence is not misconduct," and "courts frequently state that a criminal trial's purpose is a search for truth and justice." *State v. Curtiss*, 161 Wn. App. 673, 701-02, 250 P.3d 496 (2011).

The State's comments in this case are more similar to those made in *State v. Pastrana*, 94 Wn. App. 463, 972 P.2d 557 (1999), *abrogated on other grounds by State v. Henderson*, 180 Wn. App. 138, 142, 321 P.3d 298, *review granted*, 180 Wn.2d 1022, 328 P.3d 903 (2014) and *State v. Greer*, 62 Wn. App. 779, 786, 792, 815 P.2d 295 (1991). In *Pastrana*, Division Two of our court held that the prosecutor did not act improperly by stating to the jury, "You are going to tell this community whether or not shooting a gun

21

out a vehicle on the freeway at another moving vehicle and killing somebody is first degree murder or if it is not." 94 Wn. App. at 479. The court noted that the prosecutor "did not ask the jury to render a decision inconsistent with its duty of applying the law to the facts." *Id.*

*"Sad, gruesome pictures."* Mr. Scantling next argues that the prosecutor committed misconduct by referring to the pictures of Mr. Palmer as sad and gruesome. Here again, Mr. Scantling did not object to the prosecutor's statement at trial.

The State's closing argument contained a lengthy discussion of the evidence introduced as to Mr. Palmer's bullet wounds, taking the position that the three shots supported the vigorously contested element of premeditation. The prosecutor introduced his discussion of this evidence as follows:

> I apologize for showing these pictures to you, but I do remember we talked about this in jury selection. I think one of the few promises that we asked of you and one of the few chances you had to get off juror duty is say, "I'm not going to look at this; I'm not going to consider it," and I appreciate your word at the time that you're not going to hold it against us for showing you these *sad, gruesome pictures.*

RP (Sept. 11, 2013) at 396 (emphasis added).

Mr. Scantling does not explain how this statement amounted to misconduct. The only authority Mr. Scantling relies on for support is *Fisher*, which as discussed above, is inapposite.

22

The photographs *were* gruesome. For the prosecutor to briefly acknowledge that fact was not an improper appeal to the passions and prejudices of the jury. And again, because defense counsel did not object, Mr. Scantling is required, and has failed, to show that the remark was flagrant and ill-intentioned, or that it could not have been easily cured by an instruction to the jury.

*"What message is the defendant giving his kids?"* The third occasion on which Mr. Scantling contends the prosecutor improperly appealed to the passions and prejudices of the jury was when he asked the highlighted question in the course of the following argument:

> A man who cares about his children does not have to sneak in the backyard while people are sleeping. A man who cares about his children would follow up with the offer of the mother to arrange a time with advance notice to arrange a visit. A man who cares about his children doesn't sneak into the backyard and pick up a cinderblock and hurl it into the sliding glass door shattering the glass. A man who cares about his children doesn't take the risk of the glass going into his children's hair. A man who cares about his children does not enter a bedroom and look at a bed and see three sleeping children, a four-year-old, a five-year-old and a 10-year-old, a man who's motivated by a concern of his children does not see these three sleeping young children waking up and starting to cry and starting to scream, a man who cares about or is motivated by his children does not, while in the same bed with the three kids, take his hand and choke the children's mother within feet of the kids. *What message is the defendant giving his kids?*
> . . . .
> . . . Choking the children's mother in front of them. Is that concern for the children?

RP (Sept. 11, 2013) at 406 (emphasis added). Defense counsel did object to the prosecutor's question about the message Mr. Scantling was giving. To establish prejudice, he need only show that there is a substantial likelihood that any misconduct affected the jury's verdict. *Brown*, 132 Wn.2d at 561.

The State argued below and argues on appeal that the prosecutor was simply "attempting to defuse an argument the defendant had set up throughout the trial, that the defendant was just a harried man, who, after being denied seeing his children, snapped." Br. of Resp't at 20.

It is not improper to argue that the evidence does not support the defense theory. *Russell*, 125 Wn.2d at 87. And a prosecutor may make a fair response to the arguments of defense counsel. *Id.* The fact that a defendant's conduct is likely to arouse strong emotions from the jury does not mean that a prosecutor must refrain from commenting on the evidence as presented at trial. *Fleetwood*, 75 Wn.2d at 84. The prosecutor's argument was not gratuitously dwelling on conduct likely to arouse jury indignation; he was making a point about an incongruity between Mr. Scantling's defense and his actions. We do not find the question to constitute misconduct.

Finally, Mr. Scantling argues the prosecutor committed misconduct by improperly vouching for the credibility of Ms. Krebs' 11-year-old son—the oldest of her three children and the only one who testified at trial. During closing argument, the State asserted that Ms. Krebs' son "was not on that stand lying." RP (Sept 11, 2013) at 404.

24

"Whether a witness has testified truthfully is entirely for the jury to determine."

*State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). It is therefore misconduct for a

prosecutor to state a personal belief as to the credibility of a witness. *State v. Warren*,

165 Wn.2d 17, 30, 195 P.3d 940 (2008).

In this case, we need not spend time on whether the prosecutor's statement was

improper (the State vigorously contends that, in context, it was not) because it was so

clearly *not* prejudicial. Not having objected, Mr. Scantling must demonstrate that the

comment was so flagrant and ill-intentioned that corrective instructions would not have

cured its prejudicial effect.

As the State correctly points out, Mr. Scantling conceded everything to which Ms.

Krebs' son testified. Defense counsel stated in closing argument:

> Grant is guilty of burglary in the first degree. I'm not going to waste your time with that. You should go back—I'm not going to tell you what to do. I would encourage you to go back, discuss it as long as as [sic] you need to, but Grant's guilty of that. The evidence and the law is clear.
> Grant is also guilty of murder. He is. He is absolutely guilty of murder. And I hope that that doesn't shock any of you. Based on the evidence that the [sic] come in, based upon the law, Grant is guilty of murder.

RP (Sept. 11, 2013) at 411-12.

Defense counsel even told the jury, "I don't disagree with much of what [the

State] said about [Ms. Krebs' son's testimony]. I think he was telling the truth as best he

remembered it." RP (Sept. 11, 2013) at 417.

25

Mr. Scantling concedes on appeal that "the only disputed issue at trial was whether Mr. Scantling acted with premeditated intent to cause the death of another person that resulted in Palmer's death." Reply Br. at 5. Ms. Krebs's son did not testify as to any matter touching on that issue.

There was literally no good reason for Mr. Scantling's lawyer to object and suggest that this 11-year-old witness might have been lying. No prejudice is shown.

*Legal Financial Obligations*

Mr. Scantling's final challenge on appeal is to the trial court's imposition of legal financial obligations. Evidence of ability to pay was unnecessary to support the *mandatory* financial obligations imposed by the court. *State v. Lundy*, 176 Wn. App. 96, 102, 308 P.3d 755 (2013) (noting that, for these costs, "the legislature has directed expressly that a defendant's ability to pay should not be taken into account").

With respect to the legal financial obligations that were discretionary, Mr. Scantling made no objection at the sentencing hearing and thereby failed to preserve a claim of error. RAP 2.5(a); *State v. Blazina*, 182 Wn.2d 827, 833, 344 P.3d 680, (2015); *State v. Duncan*, 180 Wn. App. 245, 253, 327 P.3d 614 (2014). We will not consider the issue for the first time on appeal.

Affirmed.

No. 31940-7-III
*State v. Scantling*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, C.J.

WE CONCUR:

Brown, J.

Lawrence-Berrey, J.